# Illinois Official Reports

## Appellate Court

---

*In re J.S.*, 2018 IL App (2d) 180001

---

| | |
|---|---|
| Appellate Court Caption | *In re* J.S., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. Jonathon S., Respondent-Appellant).–*In re* T.S., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. Jonathon S., Respondent-Appellant). |
| District & No. | Second District<br>Docket No. 2-18-0001 |
| Filed | May 11, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Winnebago County, Nos. 14-JA-75, 14-JA-76; the Hon. Francis M. Martinez, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Azhar J. Minhas, of Belvidere, for appellant.<br><br>Joseph P. Bruscato, State's Attorney, of Rockford (Patrick Delfino, David J. Robinson, and Sally A. Swiss, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE ZENOFF delivered the judgment of the court, with opinion.<br>Justices Burke and Schostok concurred in the judgment and opinion. |

**OPINION**

¶ 1    Respondent, Jonathon S., appeals the Winnebago County circuit court's finding that he was an unfit parent and its order terminating his parental rights. Respondent argues that the trial court violated his statutory rights under the Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-5 (West 2016)) and his due process rights under the United States Constitution when it conducted the proceedings in his absence. For the reasons that follow, we affirm.

## I. BACKGROUND

¶ 2

¶ 3    On the afternoon of February 19, 2014, Rockford police responded to a report of a child calling out for help at the home of J.S. and T.S. Police found seven-year-old J.S. at home alone. He stated that he had been alone in the house since coming home from school. J.S. lived in the house with his mother, his mother's paramour, and his three-year-old brother, T.S. He was unable to state where his mother worked, and he did not know a telephone number where she could be contacted. J.S. shared that he sometimes babysat T.S. and the one-year-old son of his mother's paramour. Police also found marijuana, scales, and a BB pistol on a dresser. Later that evening, the Department of Children and Family Services (DCFS) took protective custody of J.S. and T.S.

¶ 4    When the boys were taken into protective custody, their father, respondent, was incarcerated at a federal correctional facility in Wisconsin, where he remained throughout the entirety of these proceedings. Respondent had been named in a 20-count federal indictment in Iowa alleging a conspiracy to manufacture and distribute large quantities of illicit drugs from 2008 to 2011. That indictment resulted in his conviction in 2012 of drug trafficking crimes and possession of a firearm in furtherance of drug trafficking crimes. 21 U.S.C. §§ 841(a)(1), (b)(1)(A), (b)(1)(C) (2012); 21 U.S.C. § 846 (2012); 18 U.S.C. § 924(c)(1)(A)(i) (2012). Respondent also had prior felony convictions in Illinois. In 2007, he was convicted of unlawful delivery of a controlled substance within 1000 feet of public housing, a Class X felony, when he twice sold crack cocaine to a cooperating witness. 720 ILCS 570/401(c)(2), 407(b)(1) (West 2006). In 2005, respondent was convicted of conspiracy to commit armed robbery, a Class 4 felony, when he and his coconspirators robbed a convenience store clerk in Boone County of $575 while using a handgun. 720 ILCS 5/8-2(a) (West 2002).

¶ 5    On February 21, 2014, the State filed neglect petitions as to J.S. and T.S. On that day, the trial court was informed that respondent was incarcerated at a federal correctional facility in Wisconsin. The mother waived her right to a shelter-care hearing, and the trial court found that there was probable cause to believe that the children were neglected. It granted temporary guardianship of J.S. and T.S. to DCFS. On April 22, 2014, DCFS conducted an integrated assessment of respondent by phone, and he indicated that he had started parenting classes and was very interested in the outcome of this case. On April 28, 2014, after being informed that respondent wished to be represented, the trial court appointed counsel. On May 22, 2014, respondent's attorney informed the trial court that a writ of *habeas corpus* had been issued directing the federal correctional facility to deliver respondent to the court but that the writ had not been honored. The trial court had previously noted that it did not believe that the federal government would honor a state writ.

¶ 6 On June 26, 2014, respondent's attorney notified the trial court that she had spoken with respondent and that he would be forwarding documentation of various services he was engaging in while incarcerated. Respondent, through counsel, waived his right to an adjudicatory hearing. The mother stipulated to one count of the neglect petition, which alleged that the minors had been left unsupervised for an unreasonable period of time. The trial court found that J.S. and T.S. were neglected minors, appointed DCFS as their legal guardian and custodian, and ordered both parents to cooperate with DCFS as to all recommended treatments and services.

¶ 7 On December 8, 2014, the trial court conducted the first permanency hearing, which covered the period beginning on June 26, 2014, and ending on December 8, 2014. The assigned caseworker for J.S. and T.S. was employed by Children's Home + Aid (CHASI), which contracts with DCFS to provide case management services. He testified that respondent had participated in an integrated assessment and had been assigned a service plan but that respondent had not maintained contact with CHASI since that time. Respondent also had not responded to several letters sent by the caseworker, the latest of which was sent in September 2014. The court directed CHASI to make more vigorous attempts to contact respondent and found that respondent and the minors' mother had both made reasonable efforts and progress toward their service plans during this review period.

¶ 8 On May 4, 2015, at the second permanency hearing, covering the period from December 9, 2014, to May 4, 2015, the CHASI caseworker submitted a report indicating that he had established regular contact with respondent via e-mail. The caseworker also reported that he had received no documentation as to any services completed by respondent or a signed copy of respondent's service plan as requested. Additionally, the caseworker testified that staff at the federal correctional facility declined to provide any information as to services completed by respondent, stating that they could not do so without respondent's consent. The trial court found that the mother had made reasonable efforts and progress, but that respondent had not made reasonable efforts or progress toward his plan during that period. The court made the same findings at several subsequent permanency hearings until July 25, 2017, when it found that the mother had also failed to make reasonable efforts or progress. At that time, the court changed the goal from returning the children home within 12 months to "substitute care pending court determination of termination of parental rights."

¶ 9 On July 28, 2017, the State filed a petition to terminate the parental rights of both respondent and the mother. The State alleged that respondent was unfit on five grounds: (1) he failed to make reasonable efforts to correct the conditions that were the basis of the removal of the children during five periods of review (750 ILCS 50/1(D)(m)(i) (West 2016)); (2) he failed to make reasonable progress toward the return of the children during six periods of review (750 ILCS 50/1(D)(m)(ii) (West 2016)); (3) he failed to maintain a reasonable degree of interest, concern, or responsibility as to the children's welfare (750 ILCS 50/1(D)(b) (West 2016)); (4) he was depraved (750 ILCS 50/1(D)(i) (West 2016)); and (5) he failed to protect the children from conditions within his environment injurious to the children's welfare (750 ILCS 50/1(D)(g) (West 2016)).

¶ 10 On September 12, 2017, at the arraignment on the State's petition, respondent's attorney informed the court that she had been sending correspondence via regular mail and e-mail to respondent but that she had not received anything back from him in several months. During that same hearing, respondent's brother indicated to the court that he was in regular

communication with respondent and that he would pass on the court's concern that respondent contact his attorney. Sometime before a status date on November 3, 2017, respondent sent a letter directly to the court. At that status date, the court announced that it had opened the letter, unaware of the contents, and passed it to respondent's attorney upon realizing its contents. In the letter, the contents of which were then presented to the court by respondent's attorney, respondent asserted that he was to be released to a halfway house in the spring of 2018 and that he had secured employment upon his release. He requested that the court delay proceedings until he had "a chance to get out and prove himself." The court expressed its understanding of respondent's position but opined that the permanency needs of the children demanded that it not delay the proceedings any longer. On that same date, the mother indicated through her attorney that she was prepared to consent to adoption by a specified person.[1] With the expectation that the mother would sign the consent, the court scheduled respondent's unfitness and best-interest hearings for December 22, 2017. It encouraged respondent's attorney to gather any documentary evidence that respondent might have. The court again noted that federal authorities might not honor a state writ to have him appear personally. However, if respondent's attorney could arrange it with the federal facility, the court would allow respondent to participate telephonically. The court stated: "I'm just trying to afford him the opportunity to participate as much as he can."

¶ 11 On December 22, 2017, at the unfitness hearing, the trial court started by announcing that respondent's attorney, after extensive effort, had been unable to arrange telephonic participation for respondent. The court announced that it would be proceeding in respondent's absence but with his attorney present.

¶ 12 The State submitted documentary evidence of respondent's felony convictions, along with the charging instruments that led to the convictions. The State's first witness was the caseworker for CHASI who was assigned to the case from August 2014 to April 2017. He testified that, during that period, he regularly sent respondent copies of his service plans, court orders, consent forms, and self-addressed stamped envelopes. All correspondence was sent via registered mail with return receipt requested, and the caseworker believed that all correspondence was received at the prison. He explained that the self-addressed stamped envelopes were included to give respondent an opportunity to communicate and send back documents, such as signed copies of his service plans, consent forms, or documents supporting his completion of required programs. He further testified that respondent never signed the consent forms, which prevented the caseworker from obtaining any information from the prison about respondent or the particular services available to him. The caseworker testified that he received a letter from respondent in October 2015, in which he stated that he would not sign anything because he was not the reason the children were taken into care. The caseworker noted that respondent sent him certificates for coursework that respondent purported to have completed in prison. These included a parenting program, a drug abuse education course, an auto sales and marketing program, a public speaking program, and a commercial driver's license familiarization class. The caseworker described his efforts to arrange visitation between respondent and his children but testified that respondent's failure

---

[1]On November 8, 2017, the mother appeared before the court. She signed a final and irrevocable consent to adoption by a specified person and was admonished by the court to ensure that she understood her rights and was acting of her own free will.

to sign consent forms and his insistence that the children be accompanied by specific family members prevented any visits from ever occurring. A second caseworker, who had been assigned to the case for the eight months preceding the hearing, testified that respondent communicated only sparingly with her by e-mail and went several months without answering inquiries. Following this testimony, the State rested and asked that the trial court dismiss the fifth count in its petition to terminate parental rights—that respondent failed to protect the children from conditions within his environment injurious to the children's welfare—which the court did.

¶ 13    Respondent's attorney asked the court to take judicial notice of the certificates respondent had provided to the CHASI caseworker. The court did so over the State's objection, indicating that it would likely give them little weight, considering that respondent refused to give consent to the caseworker that would have permitted him to verify these and other records with prison officials. Respondent rested without presenting any other evidence. During her closing argument, respondent's attorney argued that the evidence of respondent's felony convictions entered by the State had not raised the statutory presumption of depravity and that the court did not have enough information to find that respondent had not made reasonable progress toward completing his service plan.

¶ 14    The trial court found that the State's submission of three felony convictions, one of which was within five years of the State's petition to terminate parental rights, raised a rebuttable presumption that respondent was depraved, that the presumption had not been rebutted, and that there had been no evidence of rehabilitation. The court further opined that it would have found depravity even without the presumption, as the charging instruments offered by the State provided sufficient details to prove depravity by clear and convincing evidence. Additionally, the court found that respondent had failed to show a reasonable degree of interest, concern, or responsibility and had failed to make reasonable progress or efforts toward his plan during the relevant periods. The court noted that respondent's refusal to sign consent forms was self-defeating and prevented CHASI caseworkers from accessing his prison records. The court found respondent unfit as to all remaining counts and then moved to the best-interest hearing.

¶ 15    The State presented one witness at the best-interest hearing, who testified that the children had been doing exceedingly well in their foster home and that the foster family wished to adopt them. The court expressed the need to provide a permanent solution for these children. Moreover, the court concluded, respondent had not shown an ability to abide by his service plans and he still had a lengthy federal sentence to complete. Consequently, the court found that the State had proved by a preponderance of the evidence that it was in the best interests of the children to terminate respondent's parental rights. Respondent timely appealed.

¶ 16                                    II. ANALYSIS

¶ 17    On appeal, respondent contends that the trial court violated both his statutory and constitutional rights when it denied his motion for a continuance and proceeded with the unfitness and best-interest hearings in his absence. In response, the State argues that incarcerated parents do not have an absolute statutory right to be present. Moreover, the State argues that respondent's due process rights were not violated because (1) the trial court offered alternative means for respondent to participate, (2) he was represented by counsel

throughout the proceedings, and (3) the permanency interests of the children weighed heavily in favor of conducting the hearings.

¶ 18    The right of natural parents to the care and custody of their children is a fundamental liberty interest protected by the due process clause of the fourteenth amendment to the United States Constitution. U.S. Const., amend. XIV, § 1; *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). Due process is not a fixed, hypertechnical mold, but a flexible concept that affords procedural protections as demanded by specific situations. *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976). We analyze due process claims arising out of parental termination cases by balancing the three factors outlined in *Mathews* by the Supreme Court of the United States: (1) the private interest affected by the official action; (2) the risk of erroneous deprivation of that interest through the procedures used; and (3) the government's interest, which includes the function involved as well as the fiscal and administrative costs of any additional or substitute procedures. *Mathews*, 424 U.S. at 335; *In re C.J.*, 272 Ill. App. 3d 461, 465 (1995).

¶ 19    In Illinois, proceedings to terminate parental rights are conducted in a two-step process. *In re Keyon R.*, 2017 IL App (2d) 160657, ¶ 16. First, the State must prove by clear and convincing evidence at least one ground for parental unfitness under section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2016)). *In re Keyon R.*, 2017 IL App (2d) 160657, ¶ 16. If unfitness is found, the court moves to the second hearing, where the court must determine by a preponderance of the evidence the best interests of the child. *In re D.T.*, 212 Ill. 2d 347, 367 (2004). A parent has a statutory right to be present during these hearings: "[T]he minor who is the subject of the proceeding and his parents, guardian, legal custodian or responsible relative who are parties respondent have the right to be present, to be heard, to present evidence material to the proceedings, [and] to cross-examine witnesses ***." 705 ILCS 405/1-5 (West 2016). Parental presence, however, is not mandatory. *In re M.R.*, 316 Ill. App. 3d 399, 402 (2000). For example, trial courts may conduct these hearings even though an incarcerated parent is absent. See *In re A.M.*, 402 Ill. App. 3d 720, 725-26 (2010). "[I]t is well established that lawful incarceration necessarily makes unavailable many rights and privileges of the ordinary citizen." *In re C.J.*, 272 Ill. App. 3d at 464 (citing *Wolff v. McDonnell*, 418 U.S. 539 (1974)).

¶ 20    Here, respondent asserts that the trial court violated his statutory right to be present by holding the hearings in his absence. However, the record does not support respondent's contention. Respondent was lawfully incarcerated in a federal correctional facility in another state, which rendered him unable to exercise his statutory right. As noted above, the Act does not require that parents be present, nor is the trial court obliged to delay hearings until an incarcerated individual is free to appear in person. *In re C.J.*, 272 Ill. App. 3d at 466. Additionally, the trial court made efforts to afford respondent opportunities to participate. It appointed counsel as soon as it became aware that respondent desired to participate. It issued a writ of *habeas corpus* to have respondent brought before the court. It directed respondent's attorney to inquire with prison officials as to whether respondent might be allowed to participate telephonically. These were all reasonable efforts by the trial court to accommodate respondent.

¶ 21    Apart from his right under state law, respondent retained rights to due process under the United States Constitution. U.S. Const., amend. XIV, § 1. Therefore, we apply the balancing factors in *Mathews* to the facts of this case to determine whether respondent was denied due process.

¶ 22    Applying these factors, the first favors respondent. He clearly had an important, deep-seated interest in the outcome of the termination proceedings, specifically, his interest in maintaining a parental relationship with J.S. and T.S. *In re D.R.*, 307 Ill. App. 3d 478, 483 (1999).

¶ 23    The second factor requires that we look to the procedures employed by the trial court and assess the potential that they erroneously deprived respondent of his parental relationship with J.S. and T.S. While respondent was not physically present in court, he was represented by his attorney, who cross-examined each of the State's witnesses and argued vigorously on his behalf. In light of the strength of the evidence presented against respondent, it is highly unlikely that his presence would have made any difference in the outcome. The State offered evidence of his felony convictions, which gave rise to a statutory rebuttable presumption of depravity.[2] But, even had respondent been present and able to rebut the presumption, the trial court indicated that the facts and circumstances underlying the felony convictions revealed a pattern of behavior that would have led it to conclude that respondent was depraved. (Respondent does not challenge the trial court's factual findings from the best-interest hearing.)

¶ 24    Additionally, the trial court took judicial notice of the documents provided by respondent and found them insufficient to establish that he had made reasonable progress or efforts toward his plan. The sole reason that the court did not have more detailed information was respondent's failure to grant consent to CHASI caseworkers to access his prison records, which in itself supported a finding that respondent failed to make reasonable progress or efforts. His presence in the courtroom could not have excused this obstructive behavior. The parameters of due process do not provide an absolute right to be present, nor do they require continued delays until an incarcerated person is released. "All that is necessary is that the procedures be tailored, in light of the decision to be made, to 'the capacities and circumstances of those who are to be heard,' to insure that they are given a meaningful opportunity to present their case." *Mathews*, 424 U.S. at 349 (quoting *Goldberg v. Kelly*, 397 U.S. 254, 268-69 (1970)). The trial court made reasonable efforts to tailor respondent's participation in light of his circumstances, and he had ample opportunity to present his case. It is clear that the procedures used by the trial court created little to no risk of erroneously depriving respondent of his rights.

¶ 25    As to the third factor, as *parens patriae* for the removed children, the government's interest is to adjudicate the matter as expeditiously as possible. *In re C.J.*, 272 Ill. App. 3d at 466. A delay in these types of proceedings "imposes a serious cost on the functions of government, as well as an intangible cost to the lives of the children involved." *In re M.R.*, 316 Ill. App. 3d at 403 (citing *In re D.L.*, 191 Ill. 2d 1 (2000)). J.S. and T.S. were only four years and one year old respectively when respondent was incarcerated. Their bond with him was reported as either weak or nonexistent, and they had had no personal contact with him in the four years since their removal. On the other hand, testimony indicated that they were

---

[2]"There is a rebuttable presumption that a parent is depraved if the parent has been criminally convicted of at least 3 felonies under the laws of this State or any other state, or under federal law, or the criminal laws of any United States territory; and at least one of these convictions took place within 5 years of the filing of the petition or motion seeking termination of parental rights." 750 ILCS 50/1(D)(i) (West 2016).

thriving with their foster family. DCFS reported that their home care and educational needs were being met, that the foster family was willing to adopt them both, and that the biological mother had signed specific consents for them to be adopted by this family. Without doubt, the government's interest weighed against further delay, particularly when the delay would be for an undetermined period of time.[3]

¶ 26    Respondent cites *In re C.J.* in support of his contention that he should have been granted a continuance in this matter. In *In re C.J.*, the appellate court determined that a violation of due process occurred when the trial court denied the incarcerated respondent's request to participate in the termination proceedings by means other than actual presence. *In re C.J.*, 272 Ill. App. 3d at 466. The respondent first asked the trial court to continue the case for approximately a year until her release. *In re C.J.*, 272 Ill. App. 3d at 463. Anticipating a denial of that motion, the respondent alternatively asked the trial court for a continuance of the unfitness hearing at the end of the State's evidence "so she could review the transcripts from the proceeding and respond accordingly." *In re C.J.*, 272 Ill. App. 3d at 463. The trial court also denied that motion. The appellate court determined that, although it was unnecessary for the trial court to grant the continuance until the respondent was released, it should have considered alternative methods to allow her participation. *In re C.J.*, 272 Ill. App. 3d at 466. The appellate court reversed and remanded, directing the trial court to use its discretion in offering the respondent a better chance to participate. *In re C.J.*, 272 Ill. App. 3d at 466.

¶ 27    *In re C.J.* is distinguishable from the present case. The respondent there was requesting a continuance until after her release at a date certain from an Ohio prison. Here, respondent requested a continuance until after he was released, but although he indicated to the court in his letter that he would be released in the spring of 2018, the official release date on the Bureau of Prisons website was February 28, 2019. So, unlike in *In re C.J.*, the information was conflicting. Moreover, the respondent in *In re C.J.* offered an alternative means of participating in the hearing, whereas respondent in this case proposed no such alternative. Instead, it was the trial court here that suggested that respondent's attorney should attempt to set up a telephonic link for the hearing. The trial court also indicated that it would accept "certificates or whatever documentary evidence [respondent] wishes" at the unfitness hearing, explaining: "I'm just trying to afford him the opportunity to participate as much as he can. If it can't be done, I understand. I certainly would like to offer him the ability." Unlike in *In re C.J.*, where the trial court specifically denied the respondent's request to participate through alternative means, the trial court here went out of its way to suggest and accommodate alternative methods of participation for the incarcerated respondent.

¶ 28    For all of the foregoing reasons, the trial court did not deny respondent's statutory right to be present or violate his due process rights under the United States Constitution.

---

[3]Respondent indicated in his letter to the court and to his caseworker that he expected to be released to a halfway house in May 2018, but this could not be confirmed with prison officials due to respondent's failure to sign consent forms. The trial court heard testimony from the same caseworker that she had accessed the prison's public website and learned that respondent was due to be released on February 28, 2019.

## III. CONCLUSION

For the reasons stated, we affirm the judgment of the circuit court.

Affirmed.