**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2022 IL App (3d) 210433-U

Order filed February 9, 2022

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2022

| | | |
|---|---|---|
| *In re* N.D., | ) | Appeal from the Circuit Court |
| | ) | of the 14th Judicial Circuit, |
| a Minor | ) | Henry County, Illinois, |
| | ) | |
| (The People of the State of Illinois, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | Appeal No. 3-21-0433 |
| | ) | Circuit No. 18-JA-36 |
| v. | ) | |
| | ) | |
| Roseberthe D., | ) | Honorable |
| | ) | Terence M. Patton, |
| Respondent-Appellant). | ) | Judge, Presiding. |

JUSTICE HAUPTMAN delivered the judgment of the court.
Justices Daugherity and Schmidt concurred in the judgment.

**ORDER**

¶ 1     *Held*:  The termination of mother's parental rights is affirmed, where the circuit court's fitness and best interest determinations were not against the manifest weight of the evidence. Additionally, the circuit court did not violate mother's due process rights, and mother did not receive ineffective assistance of counsel.

¶ 2     Respondent mother, Roseberthe D., appeals from an order of the circuit court terminating her parental rights as to N.D. On appeal, mother raises several issues of constitutional import,

including, but not limited to, due process violations and ineffective assistance of counsel. Additionally, mother contends the circuit court's fitness and best interest determinations were against the manifest weight of the evidence.

¶ 3                                    I. BACKGROUND

¶ 4        On October 22, 2018, four days after N.D.'s birth, N.D. was taken into protective custody. The next day, the State filed a petition for adjudication of wardship (neglect petition), alleging that N.D. was neglected due to an environment injurious to her welfare pursuant to section 405/2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act). 705 ILCS 405/2-3(1)(b) (West 2018). The neglect petition alleged that mother had been diagnosed as developmentally disabled and was unable to care for her children. The neglect petition also alleged that following N.D.'s birth, mother failed to provide N.D. with proper feeding or care. The neglect petition provided that for similar reasons, two other minors had been removed from mother's care in the state of Florida.[1]

¶ 5        The circuit court conducted an adjudicatory hearing on May 17, 2019. Emalee Brink, a registered nurse at Genesis Medical Center, testified that she took care of mother during N.D.'s birth. Brink explained that in certain cases, medical staff are required to put in for a "social service consult," which provides staff with pertinent information about the patient's prior history. Based on her inquiry in this instance, Brink received information that mother did not have custody of her other children, which raised red flags. Brink testified that mother delivered on a Friday and that Brink cared for mother on Friday night, Saturday night, and Sunday night. When asked if any of mother actions were cause for concern, Brink replied:

_____

[1]We note that an amended neglect petition, which added the father, was filed on December 30, 2019.

2

"I wouldn't say that she was particularly attentive to the newborn. The baby laid in the crib a lot. There was a lot of education about, you know, 'This is when the baby needs to eat. We need to try to feed the baby every two to three hours. You know, try to change the baby's diaper when you eat [sic] so you're kind of clustering the care.' Babies sleep a lot when they're first born, so it's — you know, it's difficult sometimes to kind of read the cues about what you should be doing when, but there was several instances where there was education completed about, you know, 'When the baby cries, you need to pick the baby up. You need to feed the baby,' and I do believe at that time that's when the social service consult was placed and DCFS came in."

¶ 6 Brink described mother's actions as unusual. Brink stated that "after the fourth or fifth time and you're saying the same thing over and over again, it kind of seems like there might be some sort of barrier between, you know, what the staff is trying to educate and the understanding."

¶ 7 On cross-examination, Brink testified that mother had a C-section and that mother would have been recovering from the effects of the surgery. However, patients generally have a full range of motion within eight hours, and the effects of any epidural shot should have worn off by Saturday night. Brink observed that when babies are born, it is a happy family occasion. However, N.D. mostly laid in her crib, as medical staff continually frequented the room, prompting mother to feed and change N.D.'s diaper or to pick up N.D. to stop her from crying. Brink did not believe mother understood what the nurses were asking her to do.

¶ 8 Quyen Nguyen, a registered nurse at Genesis Medical Center, testified that she took care of mother for two nights following N.D.'s birth. Nguyen testified that mother was in pain and was not really involved with the baby during the first day after N.D.'s birth. On the second day,

mother began caring for N.D., but mother's actions were immature. The advice of the nurses went in one ear and out the other. Nguyen opined that mother really loved N.D. but did not believe mother was intellectually capable of caring for N.D.

¶ 9       On cross-examination, Nguyen testified that on the first day, mother was sleepy and did not "show interest in the baby at all." Nguyen assumed this was due to the pain medication. Mother would ask questions about how to care for the baby, and Nguyen would explain, yet mother continued to ask questions.

¶ 10       Department of Children and Family Services (DCFS) child protection specialist, Jennipher Estes, testified that she received a hotline report from Genesis Medical Center when N.D. was born. Estes responded to the hospital, where mother provided Estes with some preliminary background information concerning her other children. Mother stated that doctors in Florida thought she was going to kill her two previous newborns because they claimed mother was trying to feed the babies ice chips. Estes provided that mother's other children were born in 2008 and 2014 and that neither child lived with mother.

¶ 11       Estes testified that at the time she began investigating N.D.'s case, there was an open investigation involving mother and her brother, Romario. It was alleged that mother had been physically aggressive with Romario's two children, for whom mother babysat. Allegations of inadequate supervision had also been lodged against Romario for leaving his children in mother's custody.

¶ 12       On cross-examination, Estes testified that to her knowledge, mother's parental rights to her other children had never been terminated by a court. However, Estes indicated that mother's children were placed in permanent guardianship situations.

4

¶ 13    Mother testified at the adjudicatory hearing that she was in the hospital for two days following N.D.'s birth. Mother was in pain and was given medicine to dull the pain. Mother stated that the pain kept her from caring for N.D. as much as she wanted to. With regard to her parenting skills, mother testified that she had experience raising small children, including her three younger sisters, whom mother cared for from the time they were babies. Mother fed, bathed, and changed her sisters' diapers. For this reason, mother felt she could adequately care for N.D.

¶ 14    On cross-examination, mother testified that she started taking care of her sisters as a teenager when her parents were at work. Regarding her hospital stay, mother testified that the nurses did not adequately answer her questions. Mother stated:

> "I'm trying to learn more about [what] the nurse said — she was saying that I was asking her questions, how to feed her and diaper her, but I just want to know more, because this is my first time with [N.D.]. I didn't have my two kids. I missed out. So that's why I was asking her questions."

Mother testified that she had a 5-year-old daughter and a 10-year-old son. Mother's daughter lived with her father in Florida and her son lived with his maternal grandmother in Delaware. Mother averred that her son was not in her care because the doctor said mother was trying to feed him ice chips, which was a lie, and because mother was told she was incapable of caring for him. When asked about not having custody of her daughter, mother relayed the same story about the ice chips. Mother testified that she had tried, unsuccessfully, to regain custody of her two children back in Florida. When asked about her developmental disability, mother stated that she attempted to ask her father about her diagnosis, but he did not provide an answer. Mother testified that a doctor named William from Florida told her she did not have a developmental

5

disability. Mother testified that she graduated from high school, where she was enrolled in special education classes. Mother was currently looking for employment. Mother received Social Security disability benefits because of her "diagnosis," but she related that she did not know the nature of that diagnosis.

¶ 15    At the conclusion of the testimony, the court adjudicated N.D. neglected, finding the neglect petition proven by a preponderance of the evidence. The court reasoned that "[w]e know [mother] has developmental disabilities. She was in special ed in school. She's on Social Security disability." The court further referenced mother's vague answers concerning her mental health diagnosis and that mother's failure to feed N.D. following her birth placed N.D. at risk.

¶ 16    Prior to the dispositional hearing, Bethany for Children and Families (BCF) filed a dispositional hearing report. The report included mother's integrated assessment. The assessment provided that mother was 32 years old and was born in Haiti. Mother had been diagnosed with mild mental retardation, which is currently known as mild intellectual developmental disorder. According to the report, mother lacked the ability to understand and comprehend information and exhibited a limited understanding of the current legal proceeding. Mother had a poor memory of the timeline of events in her life. Mother reported that she graduated from high school in 2005 and that she received special education services for a learning disability. Mother lost custody of her two older children, who live out of state. Mother was not employed and lived with her brother.

¶ 17    Mother reported that she cared for her brother's children and showed the interviewers pictures of a home that was not well kept, sparking concerns that mother could be incapable of maintaining a clean and safe home. The assessment further provided that three supplementary psychological evaluations found that respondent was not capable of parenting her children due to

6

her intellectual disorder. The assessment ultimately found that mother would not be able to meet the needs of an infant without considerable oversight and support, such that it was unsafe for mother to care for an infant alone. The assessment concluded that "it does not appear there are any recommendations that could support a safe return home," where mother's intellectual deficits are lifelong and unlikely to improve to any significant degree.

¶ 18    At the dispositional hearing, the court adopted the recommendations set forth in the dispositional hearing report.[2] The court found mother unfit and ordered mother to cooperate with DCFS and to comply with the terms of a service plan.

¶ 19    Thereafter, the court entered permanency orders on October 30, 2019, January 8, 2020, July 8, 2020, January 13, 2021, and March 10, 2021. The court's orders, excluding the October 30, 2019, order, found that mother had made reasonable efforts, but not reasonable progress, toward the return of N.D. On April 13, 2021, the State filed a motion to terminate mother's parental rights (termination petition). The termination petition alleged that mother was an unfit person as described in section 50/1(D)(m)(ii) of the Adoption Act, in that mother failed to make reasonable progress toward the return of N.D. during three separate 9-month periods, being: July 11, 2019, through April 11, 2020 (period 1), April 12, 2020, through January 12, 2021 (period 2), and July 12, 2020, through April 12, 2021 (period 3).[3] 750 ILCS 50/1(D)(m)(ii) (West 2020). On June 18, 2021, the matter came before the court for the fitness portion of the termination proceeding. Though the record is devoid of a hearing transcript for this date, the court's written order indicates that mother failed to appear. The court granted mother's motion to continue the hearing until August 13, 2021.

---

[2]Counsel for mother agreed that the court's adoption of the recommendations was appropriate.
[3]We note that periods 2 and 3 overlap.

7

¶ 20        On August 13, 2021, the court conducted a fitness hearing. Counsel for mother indicated that mother had failed to appear, and the following conversation ensued:

"THE COURT: Okay.

Now, Mr. Paulson, do you know where your client is?

MR. PAULSON: I believe she's in Miami.

THE COURT: Okay.

When is the last time you had contact with her?

MR. PAULSON: I had second-hand contact —

THE COURT: I'm sorry, second-hand contact?

MR. PAULSON: I had second-hand contact a couple days ago through my assistant, Sarah. And then before that I had contact — well, another second-hand contact through [mother's] sister a couple days before that. All informing me that she's not going to be present today.

THE COURT: Okay.

So you have not been able to personally speak with her?

MR. PAULSON: No, Judge.

THE COURT: And she failed to appear June 18th and I granted the motion to continue. It was set for the unfitness. This was set for hearing in June, and I granted a continuance because she wasn't here. So Mr. Paulson, are you making a motion to continue today's hearing?

MR. PAULSON: No, Your Honor.

* * *

THE COURT: Okay.

8

I don't find any good cause to continue this. I continued it last time in June because she had been showing up for court. And you always have a concern that maybe they got the date mixed up — let's see. No, mother called and said she didn't have a ride.

MR. PAULSON: The Henry County Bus Transportation went to Cambridge instead of Geneseo or visa [*sic*] versa or something.

THE COURT: There was a mix-up, so I did not find that she was willfully failing to appear. But at this point in time, based on the facts, I am going to find a willful failure to appear, she is aware of it. And is not here."

¶ 21    Child protection specialist, Jennipher Estes, testified that she was present at the inception of the instant case through her employment with DCFS. Shortly after N.D.'s birth, Estes traveled to the hospital, where she observed mother's "minimal" interactions with N.D. Mother did not talk to or look at N.D. Mother indicated to Estes that she felt she was able to care for N.D. and wanted the opportunity to do so. However, the doctors and nurses did not believe mother was capable of caring for N.D. Ultimately, Estes made the decision to take N.D. into protective custody.

¶ 22    Next, at the State's request, the court took judicial notice of the allegations lodged in the original and amended neglect petitions. The court also took judicial notice of the testimony adduced at the May 17, 2019, adjudicatory hearing and the order entered thereafter.

¶ 23    Brittany Bulman, a child welfare specialist employed by BCF, testified that she was assigned N.D.'s case from October 2018 to September 2019. During this time, Bulman referred respondent to "ARC," which offers services to mentally handicapped individuals. However, mother was unable to obtain these services because there was a five-year wait, due to mother's insurance. From October 2018 to September 2019, mother attended supervised visits with N.D.

9

During visits, Bulman had concerns regarding mother's parenting ability. For instance, mother would constantly hold N.D. and did not know if she could put N.D. on the ground. Mother did not know what "tummy time" meant and had trouble mixing the proper amount of formula. However, mother did provide appropriate supplies for N.D. Bulman testified that mother was able to care for N.D. with her guidance and support, but that there remained no way to return N.D. to mother during this time period because of concerns about mother's mental capacity. Bulman opined that if she was not providing support, mother would not be able to appropriately feed or supervise N.D.

¶ 24 On cross-examination by mother's counsel, Bulman testified that mother had no difficulty walking, dressing herself, or maintaining appropriate hygiene. Mother was capable of working and understood most of what Bulman told her. Mother expressed to Bulman that she had cared for her siblings growing up, though Bulman could not recall whether mother had any problems caring for her siblings. On cross-examination by the guardian *ad litem* (GAL), Bulman testified that during the time period from October 2018 to September 2019, there was no significant improvement in mother's mental capacity.

¶ 25 BCF child welfare specialist, Vicki Burke, testified that she was assigned to N.D.'s case from September 2019 through April 2020. Burke received the case from Bulman and added goals of obtaining housing and employment to mother's service plan. Burke explained that when she took over the case, mother had been referred to the ARC program, due to her function and ability. In October 2019, mother informed Burke that her current residence was inappropriate for N.D. because there was exposed wiring and N.D. could never return there. Mother was placed on a waiting list for low-income housing. Mother also received Social Security disability benefits.

Burke believed mother may have worked at Goodwill for a time, but she did not provide Burke with pay stubs.

¶ 26　　　Regarding visitation, Burke testified that supervised visits became virtual in March 2020 due to the pandemic. No plan existed to transition mother to unsupervised visits for the following reasons: mother not having appropriate housing, the reports Burke received from mother's other children, and the need for several evaluations. Burke described mother's interactions with N.D. as "fairly appropriate," however, mother did not like to take direction. For example, N.D. has eczema, and mother would attempt to bring outside clothing, despite being instructed that unwashed clothing could cause an outbreak. On one occasion, mother put Vaseline in N.D.'s hair, which was difficult to extract. Burke opined that mother did not like being told how to parent and exhibited a lack of understanding concerning N.D.'s medical condition.

¶ 27　　　Burke stated that mother never came closer to having N.D. returned to her care from September 2019 through April 2020, because she did not have appropriate housing and because of the past reports concerning mother's ability to care for N.D. Burked believed mother needed supervision and support to care for N.D. Burke attributed her concerns to the reports on mother's intellectual ability. Burke testified that there were no other services or programs that could be offered to alleviate the concerns about mother's intellectual ability.

¶ 28　　　On cross-examination by mother's counsel, Burke testified that mother's behavior never caused Burke to have to end a visit. On cross-examination by the GAL, Burke testified that mother's mental capacity remained the same throughout the time in which Burke was assigned to the case.

¶ 29　　　BCF child welfare specialist, Ellen Nagle, testified that she was assigned to N.D.'s case from March 2020 through December 2020. Nagle was reassigned as mother's caseworker in May

11

2021 and was the current caseworker. Nagle testified similarly to the other caseworkers regarding mother's referral to ARC services. When Nagle took over the case, mother had goals of gaining housing, obtaining employment, and attending visitation. Nagle testified that mother had housing, but the residence was inappropriate because there was only one bedroom and mother had a boyfriend. Mother informed Nagle that she would get a larger apartment. Mother never obtained alternative housing. Regarding employment, Nagle stated that mother applied for several jobs. However, Nagle never received verification that mother was employed. Nagle did not know if mother received alternative sources of income, but mother did provide proof that she had paid rent on one occasion.

¶ 30        Regarding supervised visitation, Nagle testified that based on notes from case aids and her own observations, it would not have been safe to have unsupervised visits. Nagle believed mother had difficulty processing and applying the directions given to her. Nagle did not observe any progress made by mother toward the return home of N.D. during her time as the caseworker. Nagle attributed this lack of progress to mother's unchanging intellectual ability.

¶ 31        On cross-examination by mother's counsel, Nagel testified that mother made efforts toward reunification between July 11, 2019, and April 12, 2021. Nagel observed approximately 12 visits between mother and N.D. and only had to redirect mother one time, when mother grabbed N.D.'s arm too hard. N.D. was around two years old at the time and was shaken by the incident. Nagel admitted that she did not assist mother in obtaining a larger apartment because she did not want to disrupt the housing mother did have if mother's intellectual ability would ultimately be the deciding factor regarding mother's parental rights. Nagel described mother as well intended, but low functioning. Ultimately, Nagel testified that if mother's intellectual

12

abilities were sufficient to safely provide for N.D. and the other services were completed, the case would change entirely.

¶ 32    Following argument, the court found that mother had not made reasonable progress toward the return home of N.D. during any of the nine-month periods alleged by the State. Accordingly, the court found mother unfit by clear and convincing evidence. The court noted that the State was not required to prove mother had a developmental disability because the State had already proven this at the dispositional hearing. Rather, the court observed that the State's termination petition was based on reasonable progress, not reasonable efforts, and that after two years, mother had not improved her parenting ability, and it seemed unlikely that she would be able to do so in the future.

¶ 33    On August 13, 2021, Nagle submitted a best interest report on N.D.'s behalf. The report provided that mother completed a psychological evaluation in September 2020 and a parenting capacity evaluation in December 2020. Both evaluations determined that mother, alone, was unable to ensure the safety and well-being of N.D. The report indicated that mother was participating in visitation until she communicated that she wished to begin video visitation in March 2021. It was believed mother was attempting to conceal a pregnancy. At that time, mother was no longer acting in compliance with BCF, and the video visitations were suspended on August 1, 2021. On August 6, 2021, mother informed Nagle that she had given birth to a new baby but refused to offer further information. A subsequent investigation confirmed that mother was living with her sister and the baby in North Carolina.

¶ 34    The best interest report provided that N.D. was almost three years of age and had been in the same foster home since October 22, 2018. N.D. shared a bond with her foster parents and felt safe and loved within the home. N.D.'s foster parents were willing and able to adopt N.D. N.D.'s

foster father was employed at John Deere, while her foster mother was a homemaker. The family lived in a five-bedroom home and had a large support system, which included family members, friends, and church members. N.D.'s foster parents provided for her basic health, safety, educational, and developmental needs. The report provided that N.D. was a smart, healthy, and interactive toddler.

¶ 35    The report concluded that N.D. was almost three years of age and had been with her foster family for most of her life. N.D.'s sense of security and familiarity were with her foster family. For these reasons, the report recommended that mother's parental rights be terminated and that N.D.'s permanency goal be changed to adoption.

¶ 36    The case proceeded to a best interest hearing on September 17, 2021. At the outset, counsel for mother informed the court that mother was out of state. Mother indicated to counsel over the phone that she wished to be present and did not know the hearing had been set. Counsel made a motion to continue the case on mother's behalf. The court denied mother's motion to continue, noting that mother did not appear for the last three court dates.

¶ 37    Nagle testified consistently with her best interest report that N.D. had resided with her current foster family for nearly three years. N.D. was comfortable with and attached to her foster parents. During home visits, N.D. was happy and interacted with her foster parents. The foster family had sufficient income and housing to care for N.D. Nagle indicated that the foster family enjoyed a supportive church community. Though N.D. came from a different ethnic and cultural background than her foster parents, the foster parents were willing to embrace and teach N.D. about her culture and background. Nagle provided that if mother's parental rights were terminated, N.D.'s foster parents were willing to adopt N.D. Citing N.D.'s need for permanency, Nagle testified that it was in N.D.'s best interest to terminate mother's parental rights.

¶ 38 Regarding mother, Nagle stated that since the fitness hearing, visitation had been suspended, where there had not been communication with the agency. Since receiving a phone call from mother on August 6, 2021, there had not been consistent communication with mother. Mother's current whereabouts were unknown.

¶ 39 On cross-examination by mother's counsel, Nagle testified that despite her efforts, mother did not have the mental capacity to parent N.D. Although there were two potential relative placements for N.D., neither individual was ultimately interested. During visits, mother showed N.D. affection, though N.D. was unsure of mother at times. N.D. has not expressed a verbal preference to stay with her current foster family but was incredibly bonded to her foster parents. Nagle indicated that both foster parents were over 55 years old and that the foster mother was blind.

¶ 40 Foster mother, Sheryl Huff, testified that she lived with her husband and N.D. in Coal Valley. The family lived in a large home with a large yard. Huff had cared for N.D. since N.D. was four days old. Sheryl described N.D. as a flourishing and intelligent child. N.D. was safe and comfortable in the home and referred to the Huffs as mom and dad. Sheryl stayed at home with N.D. while her husband worked. The family had a large support system in the community. Sheryl indicated that she and her husband had attended classes and done online research to aid in addressing and fostering N.D.'s cultural background. Sheryl's cousin was also involved in Haitian missions and shared information she had learned with N.D. Sheryl believed her family could continue to provide for N.D. and intended to adopt N.D.

¶ 41 On cross-examination by mother's counsel, Sheryl testified that the cultural classes were offered through BCF and "Foster Hope." When asked how she kept track of N.D. physically, Sheryl testified that she used different methods, including placing bells on N.D.'s shoes and

15

frequently talking to N.D. Sheryl conceded that as N.D. grew older, like any other young child, she may try to run away. However, Sheryl related the plan she had in place if this occurred. Generally, Sheryl did not stray more than 8-10 feet from N.D.

¶ 42    Following argument, the court reasoned that the best interest factors outlined in section 1-3(4.05) of the Juvenile Court Act favored the termination of mother's parental rights. 705 ILCS 405/1-3(4.05) (West 2020). Accordingly, the court found the State had proven, by a preponderance of the evidence, that the termination of mother's parental rights was in N.D.'s best interest and terminated mother's parental rights. Mother appeals.

¶ 43                                   II. ANALYSIS

¶ 44                      A. Constitutionality of the Juvenile Court Act

¶ 45    Mother opens her appeal by arguing that the termination scheme provided for in the Juvenile Court Act is unconstitutional as applied to her. Mother posits that the "one-size-fits-all remedy" set forth by the Juvenile Court Act fails to adequately address scenarios where parents are relieved of their parental rights due to cognitive difficulties. In response to the State's argument on appeal that mother waived this issue by failing to raise it in the circuit court, mother responds that to the extent the constitutionality issue was waived, counsel was ineffective for failing to raise the issue in the circuit court.

¶ 46    At the outset, we agree with the State, that by failing to raise a constitutional challenge in the lower court, mother has waived the issue on appeal. *In re Jerome F.*, 325 Ill. App. 3d 812, 817 (2001); *In re O.R.*, 328 Ill. App. 3d 955, 959 (2002); *In re Marriage of Pratt*, 2014 IL App (1st) 130465, ¶ 23; see *Western Casualty & Surety Co. v. Brochu*, 105 Ill. 2d 486, 500 (1985). As such, we decline to consider mother's constitutional challenge on appeal. Furthermore, we decline to address the argument raised in mother's reply brief that trial counsel was ineffective

16

for failing to raise this constitutional challenge in the circuit court. The fleeting ineffective assistance argument contained in mother's reply brief is wholly unsupported by legal authority. In such instances, ineffective assistance arguments are deemed waived on appeal. *People v. Acevedo*, 191 Ill. App. 3d 364, 366 (1989) (holding that a litigant's failure to support his arguments with appropriate authority constitutes waiver). See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020).

¶ 47                              B. Denial of Motion to Continue/Due Process

¶ 48        Next, mother argues that the circuit court erred by denying counsel's motion to continue the best interest hearing. Mother further argues her due process rights were violated, where the court conducted the termination proceeding in her absence.

¶ 49        The caselaw provides that although a parent has the right to be present during a hearing on the termination of parental rights, a parent's presence is not mandatory. *In re S.W.*, 2015 IL App (3d) 140981, ¶ 34. When balancing a request for a continuance, courts consider the fact that a delay to termination proceedings serves to "impose a serious cost on the function of government, as well as intangible costs to the lives of the children involved." *In re A.M.*, 402 Ill. App. 3d 720, 725 (2010). Simply, courts are "not required to wait until the parent chooses to appear." *In re S.W.*, 2015 IL 140981, ¶ 34. In a proceeding under the Juvenile Court Act, the decision to deny a continuance will not be disturbed unless it resulted in a palpable injustice or manifest abuse. *Id.*

¶ 50        Here, the record reflects that the court continued the fitness hearing originally scheduled for June 18, 2021, to August 13, 2021, due to mother not having a ride. Thereafter, mother willfully failed to appear at the fitness hearing on August 13, 2021. Following that hearing, the court set the matter for a best interest hearing on September 17, 2021. To begin the best interest

17

hearing, counsel for mother informed the court that mother was out of state and did not know the hearing had been set. Counsel made a motion to continue the case on mother's behalf. The court denied mother's motion to continue, noting that mother had not appeared for the last three court dates.

¶ 51 Based on these facts, we cannot say the circuit court's denial of mother's motion to continue constituted a manifest abuse. It is undisputed that mother failed to appear at every juncture of the termination proceeding. It is further undisputed that mother's absence was willful. Mother submits no argument on appeal that she did not receive notice of the hearing date, or that some circumstance beyond her control stymied her ability to be present.

¶ 52 We further reject mother's argument that no urgency existed in this case to justify the denial of a continuance. Indeed, "the legislature intended, with good reason, that proceedings involving the termination of parental rights be handled with dispatch." *In re K.S.*, 203 Ill. App. 3d 586, 596 (1990). This is because "some or all of the children are of tender years, making them more attractive for adoption than they would be at an older age, and increasing the likelihood of a successful bonding with their adoptive parents at that younger age as well." *Id.* As such, we remain cognizant of the fact that the rights of a young child must be considered alongside mothers, and that at the best interest hearing, the court's focus shifts to the child. *In re D.T.*, 212 Ill. 2d 347, 363-64 (2004). For these reasons, we affirm the denial of mother's motion to continue the best interest hearing.

¶ 53 Turning to mother's claim that her absence during the termination proceeding constituted a denial of her due process rights, we agree that parents have a fundamental liberty interest in maintaining a parental relationship with their children, which is protected by the due process clause. *In re Vanessa C.*, 316 Ill. App. 3d 475, 481 (2000); *In re J.J.*, 201 Ill. 2d 236, 246 (2002).

18

"The due process clause of the United States Constitution provides heightened protection against government interference with fundamental rights of parents." *In re D.T.*, 2017 IL App (3d) 170120, ¶ 23. Procedural due process requires that courts afford litigants an opportunity to be heard at a meaningful time and in a meaningful manner. *In re S.W.*, 2015 IL 140981, ¶ 41. In determining what due process is required in proceedings involving a fundamental liberty interest, we consider the *Mathews* factors: (1) the private interest affected by the official action; (2) the risk of erroneous deprivation of a protected interest through the procedures used and the probative value, if any, of additional or substitute safeguards; and (3) the government's interest, including the function involved and the financial and administrative burdens that the additional or substituted procedural requirements would involve. *In re M.B.*, 2019 IL App (2d) 181008, ¶ 20 (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)). Ultimately, due process is achieved in this context through compliance with the Juvenile Court Act and fundamental fairness. *In re J.M.*, 2020 IL App (2d) 190806, ¶ 40. Appellate courts review potential due process violations *de novo*. *Id.*

¶ 54     Here, the first *Mathews* factor certainly favors mother, where mother's interest in maintaining a parental relationship with her child is so strong. The second *Mathews* factor, however, does not favor mother, where her interests were vehemently defended by her attorney at every juncture of the termination proceeding. Furthermore, based on the nature of the instant case, it is highly unlikely that mother's presence would have affected the outcome. Regarding the final *Mathews* factor, there is no question that the government retains a strong interest in adjudicating these matters as efficiently as possible. *In re J.S.*, 2018 IL App (2d) 180001, ¶ 25; see *In re K.S.*, 203 Ill. App. 3d. at 596.

¶ 55       In this case, there can be no question that the court provided mother with an opportunity to be heard at a meaningful time and in a meaningful manner and that mother willingly chose not to participate. For this reason, and for the reasons set forth in this court's *Mathews* analysis, no violation of mother's due process rights occurred.

¶ 56                             C. Ineffective Assistance of Counsel

¶ 57       Mother additionally argues that counsel was ineffective for failing to move to continue the fitness portion of the termination proceeding. To prevail on a claim of ineffective assistance of counsel, mother must establish that counsel's performance fell below an objectively reasonable standard, and that due to counsel's deficient performance, mother suffered prejudice. *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984); *In re Br. M.*, 2021 IL 125969, ¶ 43. However, this court need not determine whether counsel's performance was deficient, where no prejudice resulted from the alleged deficiencies. *People v. Albanese*, 104 Ill. 2d 504, 527 (1984); see *People v. Henderson*, 2013 IL 114040, ¶ 15 (providing that to establish prejudice under *Strickland*, a litigant must demonstrate that the unargued motion is meritorious).

¶ 58       The record reflects that several days prior to the fitness hearing in this case, counsel for mother received secondhand information that mother would not be present because she was in Miami. Mother offered no further explanation for her absence. Thus, counsel declined to make a motion to continue, where there was no arguable basis for the motion. Counsel's intuition rang true, as the court immediately commented that "I don't find any good cause to continue this," and that "I am going to find a willful failure to appear, she is aware of it. And is not here." Based on these facts, it appears that a motion to continue, had it been made, would not have been granted. Therefore, mother's ineffective assistance claim fails, where mother cannot establish prejudice.

20

¶ 59                                    D. Fitness Determination

¶ 60          Mother argues the court erred in finding her unfit. In support of her argument, mother

alleges the caseworkers testified that she was able to effectively parent N.D. and that she was

never given a chance to make reasonable progress. We disagree.

¶ 61          Parental termination proceedings are initiated by the filing of a termination petition

pursuant to the provisions of the Juvenile Court Act. 705 ILCS 405/2-13 (West 2020).

Thereafter, a parent's rights may be terminated upon clear and convincing evidence that the

parent is unfit under any of the grounds enumerated in section 1(D) of the Adoption Act. *In re

D.D.*, 196 Ill. 2d 405, 417 (2001); 750 ILCS 50/1(D) *et seq.* (West 2020). Not every alleged

ground for unfitness must by proven if a single ground is supported by clear and convincing

evidence. *In re D.C.*, 209 Ill. 2d 287, 296 (2004). A circuit court's fitness determination will not

be reversed on appeal unless the ruling is against the manifest weight of the evidence. *In re D.D.*,

196 Ill. 2d at 417. A ruling is against the manifest weight of the evidence only where the

opposite conclusion is clearly evident. *Id*.

¶ 62          At the conclusion of the fitness hearing in this case, the circuit court found that mother

failed to make reasonable progress toward the return of N.D. during any of the alleged nine-

month periods. The caselaw provides that reasonable progress is an objective standard, measured

by the amount of progress made from the conditions that existed at the time custody of the child

was taken from the parent toward the return of the child to the parent. *In re D.T.*, 2017 IL App

(3d) 170120, ¶ 17. "Reasonable progress exists when the trial court can conclude that progress

being made by a parent to comply with directives given for the return of the minor is sufficiently

demonstrable and of such a quality that the trial court will be able to order the minor returned to

parental custody in the near future." *Id*. In making this determination, reviewing courts consider

21

only the evidence occurring during the relevant nine-month periods. *In re J.L.*, 236 Ill. 2d 329, 341 (2010).

¶ 63    Turning to the merits of mother's fitness argument, we begin by noting the unique nature of this case, where, unlike ordinary circumstances, the State's allegations of parental unfitness do not stem from mother's failure to complete services in an effort to regain custody of her child. In fact, mother's inability to safely raise her child is through no fault of her own. Nonetheless, the State is obligated to act when the health and safety of a child is in jeopardy.

¶ 64    Here, the testimony adduced at the fitness hearing demonstrated that at no time since N.D. was taken into protective custody did mother make progress, such that N.D. could be returned to mother. Brittany Bulman, who was assigned to N.D.'s case during period 1, testified that mother attended supervised visits with N.D. between July 2019 and September 2019. Based on her observations, Bulman had concerns regarding mother's parenting ability. For instance, mother would constantly hold N.D. and did not know if she could put N.D. on the ground. Mother was unaware of "tummy time" and had trouble mixing the proper amount of formula. Bulman opined that if mother was not receiving support, she would not be able to appropriately feed or supervise N.D. Bulman felt there remained no way to return N.D. to mother during period 1 due to mother's mental capacity, which was unchanging.

¶ 65    Vicki Burke was assigned to N.D.'s case during period 1 and a portion of period 2. Burke testified that during period 1, in October 2019, mother did not have appropriate housing or employment. During scheduled visitation, Burke observed mother's interactions with N.D. to be "fairly appropriate." However, mother did not like to take direction. For example, mother was instructed not to bring outside clothing due to N.D.'s eczema, but mother would attempt to bring outside clothing anyway. On another occasion, mother put Vaseline in N.D.'s hair, which was

22

difficult to extract. Burke opined that mother exhibited a lack of understanding concerning N.D.'s medical condition.

¶ 66        Burke further stated that mother never came closer to having N.D. returned to her care from September 2019 through April 2020, comprising the majority of period 1 and a small portion of period 2. Burke based her assessment on the fact that mother did not have appropriate housing, as well as past reports concerning mother's ability to care for N.D. Burke's personal observations also led her to believe that mother needed supervision in order to care for N.D. Burke also testified that mother's mental capacity remained unchanged throughout the time in which Burke was assigned to the case.

¶ 67        Ellen Nagle was assigned as mother's caseworker during the majority of both periods 2 and 3. Nagle testified that mother did not have appropriate housing or employment during these time periods. Based on notes from case aids and her own observations, Nagle did not believe it would have been safe to have unsupervised visits between mother and N.D. Nagel observed approximately 12 visits between mother and N.D. Mother had difficulty processing and applying the directions given to her during those visits. Nagle did not observe that mother made progress toward the return home of N.D. during her time as the caseworker and attributed this lack of progress to mother's unchanging intellectual ability.

¶ 68        During the fitness hearing, the court also took judicial notice of the testimony adduced at the May 17, 2019, adjudicatory hearing. *In the Interest of J.G.*, 298 Ill. App. 3d 617, 627 (1998) (the trial court may take judicial notice of matters of record contained in its own proceedings); 705 ILCS 405/2-18(6) (West 2020) ("[i]n any hearing under this Act, the court may take judicial notice of prior sworn testimony or evidence admitted in prior proceedings involving the same minor if (a) the parties were either represented by counsel at such prior proceedings or the right

23

to counsel was knowingly waived and (b) the taking of judicial notice would not result in admitting hearsay evidence at a hearing where it would otherwise be prohibited."). During the adjudicatory hearing, several nurses testified that mother was not properly attentive to N.D. The nurses recounted that they attempted to educate mother regarding N.D.'s needs, but mother appeared unable to understand. For instance, despite prompting, the nurses had to continually frequent mother's room to make sure mother was feeding, changing, and comforting N.D. The medical staff did not believe mother was intellectually capable of caring for N.D.

¶ 69        Mother also testified during the adjudicatory hearing that she had lost custody of her two other children because she was told she was incapable of caring for them. Mother testified that she took special education classes in high school but was evasive when asked about her developmental disorder. Mother further averred that she received Social Security disability benefits because of her "diagnosis," but claimed to be unaware as to what that diagnosis was.

¶ 70        This court is mindful that we are to consider only the evidence occurring during the relevant nine-month periods in rendering our decision. As such, we consider the testimony from the adjudicatory hearing, only so far as to how those facts were known to caseworkers Bulman, Burke, and Nagle, and how those facts tend to support or contradict the caseworkers' testimony at the fitness hearing.

¶ 71        Overall, the State provided ample evidence that mother did not make reasonable progress toward the return of N.D. during the relevant time periods. The record reflects that mother never obtained adequate housing or employment, such that N.D. could be returned to her care. Furthermore, every caseworker that observed mother with N.D. opined that mother was incapable of caring for N.D. on her own. Unfortunately, it appears there are no services available that would allow mother to overcome her developmental disorder, such that she could effectively

24

parent N.D. We cannot say the circuit court's fitness determination was against the manifest weight of the evidence, thus, we affirm on this issue.

¶ 72                                    E. Best Interest Determination

¶ 73        Lastly, mother argues the court erred in finding that it was in N.D.'s best interest to terminate her parental rights. We disagree.

¶ 74        In a proceeding to terminate parental rights, courts weigh the parent's fundamental liberty interest in the care, custody, and management of his or her child with the child's interest in a "normal family home." *In re D.T.*, 212 Ill. 2d at 364 (quoting *Santosky v. Kramer*, 455 U.S. 745, 759 (1982)). Once the State proves parental unfitness, the interests of the parent and the child diverge, and the court's focus necessarily shifts to the child's interest in "a loving, stable and safe home environment." *In re D.T.*, 212 Ill. 2d at 363-64. At this stage, the State's burden of proof lessens to a preponderance of the evidence. *Id.* at 366-67. When considering whether the termination of parental rights serves the child's best interest, court's consider: (a) the physical safety and welfare of the child, including food, shelter, health, and clothing; (b) the development of the child's identity; (c) the child's background and ties, including familial, cultural, and religious; (d) the child's sense of attachment; (e) the child's wishes and long-term goals; (f) the child's community ties; (g) the child's need for permanence; (h) the uniqueness of every family and child; (i) the risks attendant to entering and being in substitute care; and (j) the preferences of the persons available to care for the child. 705 ILCS 405/1-3(4.05) et seq. (West 2020). A circuit court's determination as to the best interest of a child will not be disturbed on appeal unless it is contrary to the manifest weight of the evidence. *In re Parentage of J.W.*, 2013 IL 114817, ¶ 55.

25

¶ 75 Both the best interest report and the testimony at the best interest hearing established that N.D. had been in the same foster home since her birth. It is apparent that N.D. shares a strong bond with her foster parents, whom N.D. refers to as mom and dad. N.D.'s foster parents are willing and able to adopt N.D. N.D. feels safe and loved within the home. N.D.'s foster parents provide for her health, safety, educational, and developmental needs and have a large community support system. Impressively, N.D.'s foster parents have even taken preliminary steps to embrace and foster N.D.'s cultural background by attending classes offered through BCF and Foster Hope. We recognize that N.D.'s foster mother is blind and realize the unique challenges this diagnosis poses when raising a young child. However, under her foster mother's care, N.D. has grown into a smart, healthy, and interactive toddler. This record clearly establishes foster mother's ability to raise and care for N.D.

¶ 76 Ultimately, it is readily apparent that N.D.'s sense of security and familiarity lie with her foster family. N.D.'s foster family is willing and able to provide the permanency N.D. deserves. For these reasons, we affirm the circuit court's best interest determination.

¶ 77        III. CONCLUSION

¶ 78 The judgment of the circuit court of Henry County is affirmed.

¶ 79 Affirmed.