# Illinois Official Reports

## Appellate Court

---

### *In re J.M.*, 2020 IL App (2d) 190806

---

| | |
|---|---|
| Appellate Court Caption | *In re* J.M., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. Gregorio F., Respondent-Appellant). |
| District & No. | Second District<br>No. 2-19-0806 |
| Filed | February 11, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Winnebago County, No. 18-JA-9; the Hon. Francis Martinez, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Azhar J. Minhas, of Belvidere, for appellant.<br><br>Marilyn Hite Ross, State's Attorney, of Rockford (Patrick Delfino, Edward R. Psenicka, and Adam Trejo, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE BURKE delivered the judgment of the court, with opinion.<br>Presiding Justice Birkett and Justice Zenoff concurred in the judgment and opinion. |

**OPINION**

¶ 1   Respondent-father, Gregorio F., appeals from the trial court's orders finding him to be an unfit parent and subsequently terminating his parental rights to his son, J.M. Respondent's sole issue on appeal is that his right to due process was violated when the trial court denied his counsel's request for a continuance and held the proceedings in his absence when he was incarcerated. For the following reasons, we affirm.

## I. BACKGROUND

¶ 2

¶ 3   The record reflects that, on January 12, 2018, the State filed a four-count petition and alleged that four-year-old J.M. was a neglected minor pursuant to section 2-3 of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3 (West 2018)). All the counts pertained to J.M.'s mother, and at that time, respondent did not live with J.M. or J.M.'s mother. Respondent was present at the shelter care hearing held that day, and he said that he lived in Milwaukee, Wisconsin. The State informed the court that the parties had decided to waive their right to a hearing and the custody and guardianship of J.M. would be transferred to the Department of Children and Family Services (DCFS) with leave to place him with a responsible relative or in traditional foster care. The State informed the court that it was contemplating placing J.M. with respondent.

¶ 4   On January 17, 2018, the State informed the court that the parties had agreed that guardianship and custody of J.M. would be placed with respondent and that J.M. and respondent would live with respondent's mother.

¶ 5   DCFS filed a report to the court on April 17, 2018. In that report DCFS noted that, according to respondent, J.M. had "issues following directions from authority figures." Respondent also said that J.M., who was five years old at the time, had choked and slapped one of his female cousins. Respondent reported that he was working on getting J.M. counseling.

¶ 6   On June 1, 2018, the parties returned in court for adjudication. Respondent had earlier requested and been granted permission not to attend this hearing, since he lived in Milwaukee and his counsel was present at the hearing. The neglect petition had been earlier amended to add a fifth count, but none of the counts pertained to respondent. The State informed the court that the parties had agreed that the fathers[1] would waive their right to a hearing, the mother would stipulate to count V of the amended petition and counts I through IV would be dismissed. Count V alleged that J.M. was a neglected minor because his environment was injurious to his welfare "in that minor was living in a home where he, his sibling and other minors living in the house were sexually acting out and no protective means were put in place, thereby placing the minor at risk of harm." See *id.* § 2-3(1)(b). The court entered an adjudication order reflecting that agreement.

¶ 7   In a report to the court on July 13, 2018, DCFS noted that temporary guardianship was given to respondent on January 14, 2018. Respondent reported that J.M. was in school half a day and in daycare the other half of the day. J.M. had been doing well in his new

---

[1]J.M.'s mother had other children with different biological fathers also present at the hearing.

environment. DCFS recommended that the court grant custody and guardianship of J.M. to respondent and then close the case.

¶ 8      A dispositional hearing was held that day. Respondent's counsel said that he had spoken to respondent a few weeks ago and he was prepared to act on his behalf. The State told the court that the parties had agreed that custody and guardianship of J.M. should remain with respondent and that the previous order requiring respondent and J.M. to live with respondent's mother should be vacated. Respondent's counsel told the court that respondent had found his own place to live and no longer had a relationship with J.M.'s mother. The guardian *ad litem* (GAL) told the court that she had visited respondent and J.M. in Milwaukee and she had no concerns. The trial court entered a dispositional order finding J.M. to be neglected, making him a ward of the court and granting respondent custody and guardianship of J.M.

¶ 9      On October 10, 2018, respondent's counsel informed the court that respondent was not in court that day because he was in custody in Milwaukee. A caseworker from Children's Home and Aid informed the court that respondent was arrested for battering J.M. The State said that J.M. had been taken into protective custody by Wisconsin Child Protective Services. After allowing the parties to conference, the State said that it would be contacting the district attorney's office in Milwaukee to "try to figure out what their plan is." The court was told that respondent was currently out of custody. The investigative report of the alleged battery indicated that J.M. sustained injuries to 25 different areas of his body, from head to toe, and those bruises were at different stages of healing. J.M. had also sustained liver damage as a result of the battering. The cause was then set for status on October 18, 2018.

¶ 10      On that day, the State said it had spoken to the district attorney's office in Wisconsin. A petition for protective services had been filed in Wisconsin, and the court granted leave to have that petition filed in this court.

¶ 11      On November 7, 2018, respondent did not appear in court but was again represented by counsel. The State said that the Milwaukee County District Attorney's Office would consider closing the proceedings if the Illinois proceedings continued. The court noted that since respondent was under criminal indictment, he probably could not leave the State of Wisconsin. It asked respondent's attorney to contact him and discuss that matter. At the end of the proceedings, the trial court entered a temporary custody order indicating that it was a matter of urgent and immediate necessity that J.M. be placed in the temporary guardianship and custody of DCFS. DCFS was given the discretion to place J.M. with a responsible relative or in traditional foster care. Finally, the court stayed the order until the State of Wisconsin dismissed its abuse and neglect case involving this matter.

¶ 12      On November 29, 2018, the State filed a motion to vacate the dispositional order and enter a new one based upon the change in circumstances brought about by respondent's arrest for battering J.M.; the bruising on J.M.'s face, arms, legs, back, and buttocks; and J.M.'s report that respondent had hit him with a belt and that he had done so before. The State requested that J.M.'s guardianship and custody be transferred to DCFS and that DCFS have the discretion to place J.M.

¶ 13      On December 6, 2018, the GAL told the court that the juvenile case in Wisconsin had been closed and that J.M. was now in a placement in Illinois. Respondent was not present for the hearing. Respondent's counsel informed the court that he had been unable to reach him, but he had spoken to respondent's Wisconsin counsel. Counsel had also spoken to

respondent's mother, but she did not have any contact with respondent. Over respondent's objection, the trial court granted the State's motion to modify the dispositional order and transferred custody and guardianship to DCFS.

¶ 14    On January 14, 2019, DCFS filed a report with the court. In the report, DCFS indicated that, as a result of respondent's abuse, J.M. had been reentered into care on November 7, 2018. The Wisconsin authorities had transferred the case to Illinois. A DCFS worker picked up J.M. on November 9, 2018, and placed him in foster care in Rockford. Respondent had been charged with the offense of "physical abuse of a child" in Wisconsin. The respondent's service plan required him to generally cooperate with DCFS by staying in contact with the caseworker at least bimonthly, complete an Integrated Assessment, sign all required releases, and, if needed, participate in drug and alcohol treatment.

¶ 15    On that day, the parties met in court. The trial court asked respondent's counsel if respondent was in Wisconsin and whether he was being held in custody. Counsel said that respondent was out of custody and that he had spoken to respondent that morning. The court then asked if counsel knew whether respondent was going to be in court that day. Counsel said that respondent would not be in court because he did not know about this court date but that he would attend the next court date.

¶ 16    The State noted that the cause was in court for a permanency review and that it would stand on DCFS's report. No findings needed to be made about the respondent, and after the mother's findings were made, the court adjourned.

¶ 17    DCFS filed another report on May 15, 2019. It indicated that respondent had pled guilty to "child abuse, intentionally caus[ing] harm" in Wisconsin and was to be sentenced on June 3, 2019. A caseworker telephoned respondent and left him a voice message, but he did not call back. At the permanency hearing that day, respondent was not present in court. Counsel said that he had spoken to respondent a few times that morning and that although respondent was out of custody, he would not be attending the permanency hearing. The State recommended that the trial court find that DCFS had made reasonable efforts. It also recommended that the court find that respondent had failed to make reasonable efforts or progress. Specifically, the State referred to respondent's lack of contact with his caseworker and the fact that he did not complete an integrated assessment or engage in services. It also recommended that the court change the goal for J.M. from returning home to substitute care, pending a determination of termination of parental rights. In response, respondent's counsel requested that the court defer any findings until after respondent's sentencing date in order to determine if respondent was a viable option for J.M. to have a goal of return home. The court granted the State's request and found that respondent had not made reasonable progress. It therefore changed the goal to substitute care pending a determination of termination of parental rights.

¶ 18    On May 17, 2019, the State filed a motion for termination of respondent's parental rights to J.M. The State alleged that respondent was unfit on three grounds: he had inflicted extreme or repeated cruelty to J.M (750 ILCS 50/1(D)(e) (West 2018)), he had failed to protect J.M. from conditions within his environment injurious to his welfare (*id.* § 1(D)(g)), and he was depraved (*id.* § 1(D)(i)).

¶ 19    A hearing was set for June 6, 2019. At the hearing, respondent again was not present. Counsel advised the court that respondent's sentencing hearing had been continued to July 1, 2019. Counsel had spoken to defendant and had advised him not to come to court "just for an

arraignment." Counsel said that respondent planned to attend the termination of parental rights hearing. The court excused respondent's presence and continued the cause to July 16, 2019, for a hearing on the State's motion to terminate parental rights.

¶ 20 On that date, respondent again was not present in court. Respondent's counsel informed the court that, according to the foster care supervisor, respondent was sentenced on July 1, 2019, to a term of 18 months' imprisonment with the Department of Corrections in Wisconsin.[2] Counsel said:

> "I have spoken to [respondent] numerous times; I would say five or six times since January. I've spoken to his mother a couple of times. I do believe [respondent]—he had planned to be here today had he not been sentenced to DOC. I believe he would want to be here, if possible, if that is not possible, perhaps he could participate over the phone at a future date."

¶ 21 The court asked counsel if he was asking that the hearing be reset for respondent to participate by telephone, and counsel said yes. The court said that the cause was not going to be continued until respondent was released from prison; however, it was concerned that respondent's due process rights might be violated if he were not allowed to participate in the proceedings via telephone. The court then took a recess to review case law.

¶ 22 After the hearing was resumed, the court cited *In re M.R.*, 316 Ill. App. 3d 399 (2000). Referring to that case the court said:

> "It is somewhat analogous. The respondent mother in [that] case was not incarcerated but was in a psychiatric hospital when there was a motion to continue termination. The court denied the motion. The court was affirmed and said that although mother had [a] statutory right to be present at a hearing to terminate parental rights, presence is not mandatory, and she was represented by counsel who had effectively essentially represented her interest by cross-examining and pursuing the duties that are necessary to properly represent [*sic*] counsel.
>
> So, he is incarcerated. He is not present, but he is represented by counsel, and we are set for hearing. I believe this case is close enough to analogize that it would not violate the father's due process rights to proceed. So, we will proceed on that basis. We will go from there."

¶ 23 Respondent's counsel made a formal objection to the proceedings moving forward and argued that it violated respondent's due process rights for the termination hearing to be held in his absence. Counsel contended that respondent had a right to be present at these proceedings and that he had not voluntarily waived that right. The court noted the objection for the record, and the termination hearing proceeded.

¶ 24 Brianna Brand testified that she was a foster care supervisor for Children's Home and Aid. J.M. had been part of her caseload since January 22, 2019. Brand had telephoned respondent on April 22, 2019, but did not reach him. She left respondent a voice mail, but he did not return her phone call. On cross-examination, Brand said that there had been a few different caseworkers assigned to this case. She did not know if any caseworkers visited

---

[2]It was later determined that respondent had in fact received the maximum prison sentence for this offense, three years in the Wisconsin Department of Corrections. He was to be initially confined for 18 months and then engaged in extended supervision for an additional 18 months.

respondent's home when J.M. was living with him prior to September 30, 2018. She also said that previous caseworkers had attempted to contact respondent but that he did not return those calls either. Although she had been J.M.'s caseworker since January 2019, she did not attempt to call respondent until April 2019. She also did not reach out to respondent's counsel in Milwaukee, contact the Milwaukee County State's Attorney's Office, or respondent's mother. Respondent never completed an integrated assessment, and Brand did not know if respondent was given a copy of the service plan.

¶ 25 The State then asked the court to take judicial notice of the conviction in case No. 18-CF-4765 from Milwaukee County, "child abuse, intentionally caus[ing] harm." The conviction was admitted into evidence. The State and the GAL indicated that they did not have any further witnesses to present. The court asked respondent's counsel to present its case. Counsel responded, "[j]udge, while I would like to call [respondent] as a witness, he is unable to appear as he is in custody in Milwaukee County. I have no further witnesses."

¶ 26 In closing arguments, the State noted that when J.M. went to the hospital after his father had abused him, he had 57 different bruises to his face, chest, arms, legs, buttocks, and back. The bruises were in various colors. He also had liver damage because of the beating. J.M. said that his father had injured him and that it was not the first time he had done so. The State argued that the abuse had occurred repeatedly over the course of weeks. For these reasons, the State asked the court to find that it had met its burden on all three counts in its motion to terminate respondent's parental rights.

¶ 27 Respondent's counsel argued that respondent had custody of J.M. from January 17, 2018, until the abuse occurred around September 30, 2018. Therefore, he claimed, had some other abuses occurred prior to that time, it would have been noticed by someone. As to the injurious environment count, counsel contended that the State did not provide enough information to prove that count. As for the depravity count, counsel argued that the State provided no evidence that respondent had been convicted of the three felonies needed to prove such a count. Finally, counsel argued that respondent's incarceration was not a reason, in and of itself, to terminate his parental rights and that the State had failed to meet its burden on any of the counts in its motion to terminate parental rights.

¶ 28 The GAL agreed with the State that the motion to terminate parental rights should be granted. On July 29, 2019, the parties, minus respondent, appeared in court, and the trial court issued its ruling. As to count I, that respondent inflicted extreme or repeated cruelty to J.M., the court relied on the initial assessment from the Milwaukee juvenile case to conclude that the repeated battering of J.M. could only be described as torture. Therefore, it found count I proven by clear and convincing evidence. The court also found that count II was proven by clear and convincing evidence because the beating created an injurious environment for J.M. Finally, the court held that count III, depravity, had been proven by clear and convincing evidence because section 1(D)(i)(7) of the Adoption Act defined depravity as "an act that constitutes an offense of aggravated battery against any child." See 750 ILCS 50/1(D)(i)(7) (West 2018). It noted that although respondent was convicted in Wisconsin, the conduct for which he was convicted was classified as an aggravated battery in Illinois. The State had also shown that respondent had an "inherent deficiency of moral sense and rectitude."

¶ 29 After evidence was presented at a best interest hearing, the trial court found that it was in J.M.'s best interest that respondent's parental rights be terminated. Respondent timely

appealed.

¶ 30                                    II. ANALYSIS

¶ 31        On appeal, respondent argues that the trial court's order terminating his parental rights to J.M. should be reversed because his constitutional right to due process was violated when the termination proceedings were allowed to take place when he was incarcerated and therefore not able to be present in court. Respondent contends that this issue should be reviewed *de novo*.

¶ 32        In response, the State disagrees with respondent's claim that his due process argument should be reviewed *de novo*. Specifically, it argues that respondent's due process argument is displaced because our supreme court has held, without qualification, that due process is in no way involved with the issue of whether a trial court abused its discretion in denying a motion for a continuance. *In re S.B.*, 2015 IL App (4th) 150260, ¶ 21 (citing *Benton v. Marr*, 364 Ill. 628, 630 (1936)). We will address this issue first.

¶ 33                    A. Due Process Implications on a Motion to Continue

¶ 34        In *In re S.B.*, 2015 IL App (4th) 150260, the respondent-mother argued on appeal that her due process rights were violated when her children were adjudicated neglected and made wards of the court when she was en route to the proceedings and the Department of Corrections vehicle in which she was traveling was delayed due to snow. Respondent's counsel was present in court and objected to the court proceedings continuing without his client both at the adjudicatory and dispositional hearings that were held the same day. *Id.* ¶¶ 12, 14.

¶ 35        On appeal, the appellate court referred to two cases in which the reviewing court held that the trial court's denial of a continuance violated the respondent-parent's due process rights: *In re M.R.*, 316 Ill. App. 3d 399, and *In re C.J.*, 272 Ill. App. 3d 461 (1995). See *In re S.B.*, 2015 IL App (4th) 150260, ¶ 20. However, the *S.B.* court found that those cases were misplaced because the supreme court has held, without qualification, that " '[t]he sole question relating to the denial of [a] motion for a continuance is whether or not the trial court erred in its exercise of judicial discretion. Due process is in no wise involved.' " *In re S.B.*, 2015 IL App (4th) 150260, ¶ 21 (quoting *Benton*, 364 Ill. at 630).

¶ 36        The *S.B.* court noted that a long line of cases had held that the denial of a motion to continue did not implicate a litigant's due process rights. *Id.* After citing a myriad of cases, the *S.B.* court acknowledged that the cases it cited involved an interest in property, and its case involved a liberty interest, *i.e.*, respondent's interest in the care, custody, and control of her children. *Id.* Nevertheless, it said, "the due-process clauses of the federal and Illinois constitutions apply just as much to deprivations of property as to deprivations of liberty." *Id.* Therefore, it reasoned, if a motion to continue in a case involving the deprivation of property did not present a due process issue, then the same must be true in a case involving the deprivation of liberty. *Id.*

¶ 37        Respectfully, we must disagree with the holding in *S.B.* As support for its holding that a motion to continue in a termination of parental rights case did not implicate a parent's due process rights, the *S.B.* court cited an Illinois Supreme Court case that was 80 years old at the time, *Benton*, 364 Ill. 628. However, the *Benton* case did not involve a termination of

parental rights. The issue in that case was simply whether a litigant in a civil suit was deprived of his due process rights when he moved for a continuance to have a witness that he had not subpoenaed testify. *Id.* at 628-29. Here, the issue is whether the denial of a motion to continue *in a termination of parental rights case* in order for an incarcerated parent to participate violates that parent's due process rights. Our supreme court has held that the termination of parental rights affects a fundamental liberty interest and, therefore, must comport with the requirements of due process. *In re J.J.*, 201 Ill. 2d 236, 243 (2002). We cannot review this issue in a vacuum and say that since we are reviewing a motion to continue, it does not matter that the case itself involves a fundamental liberty interest. This case involves a father's request to attend or otherwise participate in the hearings that might ultimately result in him losing his parental rights to his son. For these reasons, we find that a due process analysis is appropriate and therefore a *de novo* standard of review applies. See *In re A.M.*, 402 Ill. App. 3d 720, 723 (2010) (a contention of a due process violation in a termination of parental rights case is reviewed *de novo*).

¶ 38                               B. Alleged Due Process Violation

¶ 39        Having determined that due process is implicated in this case and that we will review the trial court's order denying respondent's counsel's motion to continue *de novo*, we now turn to the issue of whether respondent's right to due process was violated here.

¶ 40        The due process clause of the United States Constitution provides heightened protection against governmental interference with parents' fundamental rights, including their right to make decisions concerning the care, custody, and control of their children. See U.S. Const., amend. XIV, § 1; *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). In limited instances, though, the State must interfere with fundamental parental rights to protect the health, safety, and welfare of the children. *Wickham v. Byrne*, 199 Ill. 2d 309, 317 (2002). Due process is achieved in these circumstances by compliance with the Act and fundamental fairness. *In re D.T.*, 2017 IL App (3d) 170120, ¶ 23. Due process is not a fixed, hyper-technical mold but a flexible concept that affords procedural protections as required by specific situations. *In re J.S.*, 2018 IL App (2d) 180001, ¶ 18 (citing *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976)).

¶ 41        In determining what due process requires in proceedings that involve a fundamental liberty interest, three factors must be considered: the private interest affected by the official action; the risk of erroneous deprivation of a protected interest through the procedures used and the probable value, if any, of additional or substitute safeguards; and the government's interest, including the function involved and the financial and administrative burdens that the additional or substituted procedural requirements would involve. *In re M.B.*, 2019 IL App (2d) 181008, ¶ 20 (citing *Mathews*, 424 U.S. at 335); *In re Andrea F.*, 208 Ill. 2d 148, 165 (2003) (these same factors apply to assess due process violations under the Illinois Constitution in termination of parental rights cases).

¶ 42        In Illinois, parental termination proceedings are conducted in a two-step process. *In re Keyon R.*, 2017 IL App (2d) 160657, ¶ 16. First, the State must prove by clear and convincing evidence at least one ground for parental unfitness under section 1(D) of the Adoption Act. See 750 ILCS 50/1(D) (West 2018). If unfitness is proven, the proceedings continue to the second hearing, where the State must prove by a preponderance of the evidence that termination of a parent's right is in the best interest of the child. *In re C.P.*, 2019 IL App (4th) 190420, ¶ 71. A parent has a statutory right to be present during these

hearings. *In re J.S.*, 2018 IL App (2d) 180001, ¶ 19. A parent's presence, however, is not mandatory. *Id.* Trial courts may conduct these hearings even though a parent is incarcerated and absent. *Id.* "[I]t is well established that lawful incarceration necessarily makes unavailable many rights and privileges of the ordinary citizen." *In re C.J.*, 272 Ill. App. 3d at 464.

¶ 43    In applying the *Mathews* factors, the first factor, the private interest affected by the official action, favors respondent. As this court has held before, a parent "clearly ha[s] an important, deep-seated interest in the outcome of the termination proceedings, specifically his interest in maintaining a parental relationship with [his children]." *In re J.S.*, 2018 IL App (2d) 180001, ¶ 22.

¶ 44    The second factor requires us to review the risk of erroneous deprivation of a protected interest through the procedures used by the trial court and the probable value, if any, of additional or substitute safeguards. Respondent contends that the trial court erroneously relied on *In re M.R.*, 316 Ill. App. 3d 399, when it denied his request to continue the case to explore the possibility of participating in the proceedings via telephone. In that case, the respondent's counsel informed the court on the day termination proceedings were to begin that respondent was in a psychiatric hospital and her length of stay there was unknown. *Id.* at 400. Counsel asked for a continuance, but he also said that he was " 'ready to go forward.' " *Id.* The trial court denied the request and noted that respondent was " 'ably represented by counsel.' " *Id.* at 400-01. The appellate court held that the second *Mathews* factor was satisfied when respondent's counsel fully cross-examined the witnesses and argued respondent's case to the trial court. *Id.* at 402-03.

¶ 45    We agree with respondent that the trial court erred in relying on *In re M.R.* as an analogous case. Here, unlike in *In re M.R.*, respondent's counsel never answered ready for trial. Instead, he asked for additional time to attempt to at least involve respondent telephonically in the proceedings. Also, after the State rested, respondent's counsel noted that he would have liked to call respondent as a witness, but he was unable to do so due to his incarceration. Therefore, we find that *In re M.R.* was not a suitably analogous case for the trial court to rely upon in denying counsel's motion to continue. However, simply because the trial court erred in relying on *In re M.R.* does not end our determination of whether the second *Mathews* factor was met when the trial court denied counsel's motion to continue.

¶ 46    Respondent also argues that this factor favors him based upon the facts in what he claims is an analogous case, *In re C.J.*, 272 Ill. App. 3d 461. We are not persuaded that *In re C.J.* is similar to the instant case. In that case, the respondent personally wrote a letter to the court indicating her desire to not have her parental rights terminated. *Id.* at 463. She filed a motion to continue two months before the proceedings began and asked that the case be continued until she was released from prison, providing a specific release date. *Id.* In the alternative, she requested that the hearing be continued at the end of the State's case so that she could review the transcripts from the proceeding and respond accordingly. The trial court denied the motion and proceeded to the hearing on the petition to terminate the respondent's parental rights without her participation. *Id.* Regarding the second *Mathews* factor, the appellate court held that the procedures, or lack thereof, used by the appellate court "might well have led to an erroneous deprivation of her parental rights." *Id.* at 465.

¶ 47    Unlike *In re C.J.*, in this case, respondent was afforded procedures to guard him from having his due process rights violated. Although he was not present in court, respondent was

represented by counsel who cross-examined the State's witnesses and argued vigorously on his behalf. Further, based upon the strength of the State's case, it is highly unlikely that respondent's presence would have made any difference to the outcome. In finding all three counts of the termination petition proven by clear and convincing evidence, the trial court noted that respondent was responsible for extreme and repeated cruelty to J.M., inflicting over 57 bruises on the boy's body, and that conduct created an injurious environment for J.M. The court also found that the conduct for which respondent pled guilty in Wisconsin legally constituted aggravated battery of a child in Illinois, which made respondent legally depraved under the Adoption Act. See 750 ILCS 50/1(D)(1)(7) (West 2018). Since respondent was represented by an attorney and his presence would have made little or no difference based upon the evidence presented, we find that this factor does not favor respondent. See, *e.g.*, *In re J.S.*, 2018 IL App (2d) 180001, ¶ 23 (second *Mathews* factor not met when, among other factors, the respondent was represented by counsel who vigorously defended the respondent and the strong evidence against the respondent made it unlikely that his presence would have changed the outcome of the proceedings). Respondent argues that the facts in this case differ from *In re J.S.* because, in that case, the parent's counsel had at least provided some documentary evidence on behalf of the parent. Here, however, no documentary evidence was presented on behalf of respondent. We are not persuaded. Documentary evidence aside, we find the fact that respondent was represented by counsel, who vigorously defended respondent's case and crossed examined the State's witnesses, coupled with the strong evidence against defendant, indicates that there would be little or no value to any additional or substitute safeguards.

¶ 48     As to the third *Mathews* factor, as *parens patriae* for J.M., the government's interest is to adjudicate the matter as expeditiously as possible. *Id.* ¶ 25. A delay in these proceedings "imposes a serious cost on the functions of government, as well as an intangible cost to the lives of the children involved." *In re M.R.*, 316 Ill. App. 3d at 403. Respondent argues first that this factor favors him because the cost of transporting him from Milwaukee to Winnebago County would not have involved much cost or burden. Also, if he had been allowed to testify via telephone, the cost in time to transport him would not be an issue. The State's interest in preserving and promoting J.M.'s welfare would not have been burdened by continuing the cause for a short duration to explore an electronic alternative to his physical presence.

¶ 49     We agree with respondent that the cost of transporting him from Milwaukee to Winnebago County would not have involved much cost or burden. However, arranging for such a transport and getting approval from the Wisconsin Department of Corrections could have created a lengthy delay in the proceedings, especially because this option was not discussed until counsel asked for a continuance at the beginning of the unfitness hearing. Also, since respondent's counsel informed the court at that hearing that the foster care supervisor told him that respondent had been sentenced to imprisonment, and not respondent himself, it appears unlikely that respondent requested to be able to call into the proceedings. If the court granted the continuance and allowed respondent and his counsel to explore the possibility of being a part of the proceedings telephonically, that delay would have caused J.M. to have to wait even longer for a permanent placement. As we have found, the evidence was so strong against respondent that his presence, in person or telephonically, would do

little to change the outcome of this case. Therefore, we find that the third *Mathews* factor does not indicate that respondent's constitutional rights to due process were violated.

¶ 50    For the foregoing reasons, the trial court did not deny respondent's due process rights by holding proceedings to terminate his parental rights when respondent was incarcerated and not present in court.

¶ 51                                    III. CONCLUSION

¶ 52    The judgment of the circuit court of Winnebago County is affirmed.

¶ 53    Affirmed.