2026 IL App (2d) 250584-U
No. 2-25-0584
Order filed May 13, 2026

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

*In re* W.G., a Minor

(The People of the State of Illinois, Petitioner-Appellee,
v. William G., Respondent-Appellant).

Appeal from the Circuit Court of McHenry County.
Honorable Carl E. Metz II, Judge, Presiding.
No. 24-JA-44

PRESIDING JUSTICE KENNEDY delivered the judgment of the court.
Justices Jorgensen and Schostok concurred in the judgment.

**ORDER**

¶ 1     *Held*:  The trial court did not err in finding respondent unfit, because the State's evidence proved that respondent was depraved by clear and convincing evidence. Therefore, the court did not err in terminating respondent's parental rights. Affirmed.

¶ 2     Respondent, William G., argues on appeal that the trial court erred in terminating his parental rights to his son, W.G., because the State failed to prove that he was an unfit parent. For the following reasons, we affirm the court's termination of his parental rights.

¶ 3                                   I. BACKGROUND

¶ 4     Respondent was incarcerated when Courtney K.B. was around two months pregnant with W.G., his biological son. W.G. was born on April 24, 2024, and the Department of Children and

Family Services (DCFS) documented that, following his birth, W.G. tested positive for methamphetamine, amphetamine, cocaine, opiates, and THC. Courtney reported that she had used heroin on the day of W.G.'s birth. After W.G. spent weeks in neonatal intensive care, the State took him into protective custody on May 10, 2024.

¶ 5     On May 14, 2024, the State petitioned for adjudication of wardship of W.G. At the time of the petition, respondent's paternity of W.G. was not yet established. In the petition, the State alleged as follows. Both Courtney and respondent had a history of abusing controlled substances, with Courtney testing positive for methamphetamine, amphetamine, THC, and cocaine on April 24, 2024, the day of W.G.'s birth. W.G. tested positive on or around April 24, 2024, for the same drugs as Courtney plus opiates. Following his birth, W.G. exhibited withdrawal symptoms and had to remain in neonatal intensive care, where he was administered morphine to manage his withdrawal until at least May 9, 2024. W.G. had two half-siblings, S.K. and R.G. Like W.G., both S.K. and R.G. were born to Courtney with substance exposure.

¶ 6     The petition continued that, on or about July 25, 2023, respondent was charged with multiple counts of possession with intent to deliver (methamphetamine, fentanyl, heroin, and cocaine) in McHenry County. On or about September 19, 2023, respondent was further charged with multiple counts of possession with intent to deliver (heroin, fentanyl, and cocaine) in Lake County. Courtney had a history with DCFS that included indications for inadequate supervision and environmental neglect.

¶ 7     The petition alleged that W.G. was a neglected minor for several reasons, including that he was not receiving the proper support, education, or medical or other care necessary for his well-being (705 ILCS 405/2-3(1)(a) (West 2024)); he was a newborn infant whose blood, urine, or meconium contained a controlled substance (*id.* § 2-3(1)(c)); and his environment was injurious

to his welfare (*id.* § 2-3(1)(b)). The petition stated that W.G. was in DCFS custody and contended that it was in his best interest for the court to adjudge him a ward of the court.

¶ 8 On August 9, 2024, following a hearing, the trial court entered an adjudicatory order. It found that W.G. was neglected in that he was in an environment injurious to his welfare (705 ILCS 405/2-3(1)(b) (West 2024)) and was a newborn exposed to illicit drugs (*id.* § 2-3(1)(c)). It set a dispositional hearing for September and ordered that the Youth Service Bureau (YSB) be the agency to investigate and prepare a report on W.G. and his family situation.

¶ 9 YSB caseworkers completed an integrated assessment, which was completed and approved on August 20, 2024. Concerning respondent, the integrated assessment provided as follows. Respondent was 42 years old and participated via telephone because he was detained at the time. Respondent was "guarded throughout the interview," "provided information discrepant from available reports," and "appeared to give socially desirable responses and may have minimized concerns," affecting the reliability and credibility of his responses.

¶ 10 Respondent was not employed because he was detained. He reported that he had worked for 14 months from 2005 to 2006 as a machine operator in North Chicago, but he was terminated for falsifying another employee's timesheets. No further work history was reported.

¶ 11 Respondent's criminal record consisted of 14 convictions stemming from 78 charges, including 1 conviction of assault and 11 for dangerous drugs. He also had one conviction for obstruction of justice and one for obstructing the peace. He was currently detained in Lake County awaiting disposition on a drug charge. He reported that he was out of jail on bond from charges in McHenry County when he was arrested and detained in Lake County. He also reported being detained multiple times previously for battery and criminal damage to property.

¶ 12    Respondent reported being in a "casual, sexual relationship" with Courtney. He was "guarded" about his other romantic relationships. He was currently married to another woman, Dawnniesha G., with whom he had three children, who at the time were ages 10, 7, and 2. He had had another child with another woman, Deshawna H., but their child had died at the age of 17. Respondent reported that there was intimate partner violence in his relationship with Deshawna, and he had been charged with domestic battery against Deshawna.

¶ 13    The assessment noted that respondent was also guarded about his substance abuse history, providing minimal information. His 31 charges related to drugs included then-current charges for manufacturing and delivering illegal substances. Respondent exhibited difficulty in regulating his anger and emotions, as well as disruption in his interpersonal relationships. The assessment stated that he was likely aware that Courtney was abusing substances while pregnant with W.G. and was not receiving routine prenatal care, but he took no protective action in response.

¶ 14    The assessment provided that respondent "exhibits poor judgment, criminal behavior, lacks the ability to focus on his children's needs, limited problem-solving skills, and poor discernment of risk, which affects his ability to parent safely." Respondent stated he would participate in recommended services but was not currently involved in any treatment. His ability to remain substance free upon release was unknown. The assessment noted that respondent's long-term sobriety upon release was uncertain and would likely involve relapses and multiple attempts, with ongoing aftercare needed to improve the chances of a sustained recovery. It also provided that respondent's "regular attendance in treatment is not a reliable measure of true engagement," as any measurement of progress may be difficult given his approach to engagement with providers is guarded or inauthentic. Respondent also lacked insight into his problems, and if he continued to lack insight, "interventions will have a minimal effect and [W.G.] would be at risk of harm in his

care." At the time of the assessment, respondent did not want to participate in visitation with W.G., because paternity had yet to be established.

¶ 15 The assessment set several goals for respondent: (1) resolve his current criminal involvement and refrain from further criminal involvement; (2) participate in random toxicology screenings; (3) complete a substance abuse assessment and follow all recommendations; (4) participate in a DNA test to determine paternity; and (5) participate in individual psychotherapy. Additionally, the assessment recommended the following for respondent's wellbeing: (1) obtain and maintain a stable income through employment or government benefits, and (2) obtain and maintain stable housing.

¶ 16 An August 26, 2024, YSB report provided that respondent was incarcerated in Lake County jail but being held at the McHenry County jail as a courtesy. He had been cooperative with YSB. The report summarized his recommended services as individual therapy, a substance abuse assessment plus following its recommendations, random drug testing, resolution of criminal cases and refrainment from further criminal involvement, and DNA testing.

¶ 17 A family service plan was approved on August 27, 2024. At the time, determination of respondent's paternity was in progress. The recommended permanency goal was return home within 12 months, and respondent's primary needs were cooperation, stability, sobriety, and mental health. For cooperation, his needs included maintaining contact with the caseworker, attending court hearings, and refraining from illegal activity. He was also to cooperate with DNA testing. For stability, he needed to maintain safe and adequate housing, provide proof of housing, have safe and adequate transportation, be able to provide financially for himself and W.G., provide proof of income, and refrain from illegal activity. For sobriety, he needed to refrain from using any intoxicating substances, including alcohol, marijuana, and illegal drugs; to complete a substance

abuse assessment and follow any resulting recommendations; and to submit to random urine screens to verify sobriety. Last, for mental health, the report recommended that respondent participate in individual therapy.

¶ 18    On September 5, 2024, the trial court entered a dispositional order. The court found that respondent was unfit and unable to care for W.G. because he had to comply with the service plan, including maintaining stable housing and income, obtaining substance abuse treatment, performing random drug screens, and engaging in individual therapy. It found the service plan appropriate, and it set a permanency goal of return home within 12 months. Respondent's visitation with W.G. was at the discretion of DCFS. The court made W.G. a ward of the court and placed his custody and guardianship with the guardianship administrator of DCFS.

¶ 19    Respondent's paternity was established by DNA analysis sworn to on September 10, 2024, the report of which was filed with the trial court the following day.

¶ 20    Per a November 17, 2024, YSB report, respondent was being held at the McHenry County jail and had begun weekly video visitation with W.G. on November 6. Respondent reported he was on the waiting list for parenting classes. W.G. had been moved to a traditional foster care home with his half-brother on September 13, 2024. The report noted that YSB was "guarded" toward the goal of return home within 12 months because Courtney was completely uninvolved and respondent was sentenced to at least 4 years with another criminal case pending. The YSB report recommended that the permanency goal remain return home within 12 months and that respondent be found to have made minimal efforts and no progress toward the goal of return home.

¶ 21    The November 17, 2024, family service plan provided as follows. The recommended permanency goal remained return home within 12 months. Respondent's primary needs remained cooperation, stability, sobriety, and mental health. Respondent had cooperated by participating in

the integrated assessment, in DNA testing, and with court hearings, but he had not provided the caseworker with records of services. Respondent was evaluated as making unsatisfactory progress on all recommended actions related to stability, due to being incarcerated. He had made unsatisfactory progress on sobriety because he was incarcerated and had not yet provided records of a substance abuse assessment. For mental health, he was likewise evaluated as making unsatisfactory progress because he was incarcerated and YSB had not received records of services.

¶ 22    On November 22, 2024, the trial court entered a permanency order, for which it had considered the most recent service plan and YSB report, and the stipulation of the parties. It found that the appropriate permanency goal was return home within 12 months and that the services in the service plan were appropriate. It further found that, over respondent's objection, he had made neither reasonable progress nor reasonable efforts toward returning W.G. home, noting that he was in prison. As to respondent's fitness, it found him unfit and unable to parent W.G. Finally, it made a finding of paternity based on the DNA results and ordered YSB to provide services.

¶ 23    The March 6, 2025, service plan continued recommending a permanency goal of return home within 12 months. The recommended actions and services for respondent remained substantially the same as the last DCFS service plan. He was evaluated as having made unsatisfactory progress on his recommended needs of cooperation, stability, sobriety, and mental health. Notably, the agency had not received any records regarding respondent's substance abuse assessment nor his participation in individual therapy.

¶ 24    A YSB report from March 7, 2025, provided that respondent continued to be incarcerated and had been moved to the Pinckneyville correctional center with a projected parole date of September 15, 2028. He had been consistent with visitation and contact prior to his move to Pinckneyville, but since the move, he had not contacted his caseworker. The caseworker had sent

him a letter on March 4, 2025. The report did not specify when respondent was moved to Pinckneyville. While at the county jail, he had been unable to complete services or provide documentation to the caseworker. The report recommended a change in the permanency goal to substitute care, and it recommended that respondent be found to have made unsatisfactory progress and to have not made reasonable efforts.

¶ 25 Another service plan, dated May 8, 2025, reiterated the same four needs as prior plans, and it evaluated respondent's progress as unsatisfactory on all four. Respondent had not been in contact with his caseworker, and YSB had no records related to his recommended services, such as a substance abuse assessment or individual therapy.

¶ 26 A May 9, 2025, YSB report noted that respondent still had not been in touch with a caseworker since his move to Pinckneyville Correctional Center, despite the letter from his caseworker sent March 4, 2025. His projected parole date remained September 15, 2028. The report recommended that the court find that respondent had not made reasonable progress or efforts and that the permanency goal be changed to substitute care.

¶ 27 On May 15, 2025, following a hearing, the trial court entered a permanency order changing the permanency goal to substitute care pending a determination on the termination of parental rights. The court found that respondent had not made reasonable progress toward W.G.'s return home, although it found over the State's objection that he had made reasonable efforts toward W.G.'s return home.

¶ 28                           A. Petition to Terminate Parental Rights

¶ 29 On June 4, 2025, the State petitioned to terminate respondent's (and Courtney's) parental rights. Regarding respondent, the State alleged five bases of unfitness: (1) failure to maintain a reasonable degree of interest, concern, or responsibility as to W.G.'s welfare (750 ILCS 50/1(D)(b)

(West 2024)); (2) depravity, in that he had been convicted of at least three felonies, with at least one of those convictions taking place within five years of the filing of the petition to terminate parental rights (*id.* § 1(D)(i)); (3) failure to make reasonable efforts to correct the conditions that were the basis for removal in the nine-month period from August 9, 2024, through June 4, 2025 (*id.* § 1(D)(m)(i)); (4) failure to make reasonable progress toward W.G.'s return for the same nine-month period (*id.* § 1(D)(m)(ii)); and (5) incarceration at the time of the petition's filing, with little contact with W.G. prior to incarceration and his incarceration preventing him from discharging his parental duties for more than two years (*id.* § 1(D)(r)).

¶ 30                                    B. Parental Fitness Determination

¶ 31    On August 28, 2025, the trial court heard the fitness portion of the petition to terminate parental rights. Courtney did not appear and defaulted.

¶ 32    At the start of the hearing, the State asked the trial court to take judicial notice of several items, including respondent's IDOC inmate status, which noted an admission date of February 7, 2025, a projected parole date of September 1, 2028, and projected discharge date of September 3, 2028.

¶ 33    The State called two witnesses. The first was Dionca Harper, a current supervisor and prior investigator with DCFS. She simply identified People's Exhibit 1, which was an investigative report for W.G. from June 25, 2024, making an indicated finding. The exhibit was admitted without objection.

¶ 34    The State's second witness was Jessica Bartlett, a foster care supervisor with YSB, and she testified as follows. She was the supervisor assigned to W.G.'s case since June 1, 2024. She identified several documents that were admitted into evidence without objection: the integrated assessment; two family service plans dated November 17, 2024, and May 8, 2025; and three YSB

reports dated August 26, 2024, November 17, 2025, and May 9, 2025. Respondent's recommended services included substance abuse services, individual therapy, and DNA testing. Respondent had been in contact with YSB while in custody in the McHenry County jail, but, to her knowledge, he was unable to complete any services. She believed he was on a waiting list for a parenting class but that it never began.

¶ 35    Bartlett continued that, once respondent transferred to an IDOC facility, communication with YSB stopped despite the YSB case worker having sent him letters. Prior to his transfer to IDOC, he had been participating in weekly video visits with W.G. Since his transfer, she was unaware of any communication that respondent had had with W.G., and she was also unaware if he had sent him any letters or gifts. Also, respondent had not provided YSB with proof of engagement in any services while in the IDOC facility. YSB had been able to obtain and review records of services in cases other than respondent's case.

¶ 36    Following Bartlett's testimony, the State introduced several more exhibits, which were certified copies of three of respondent's convictions. They were for case Nos. 21-CF-1733 (Cir. Ct. Lake County), 23-CF-724 (Cir. Ct. McHenry County), and 17-CF-254 (Cir. Ct. Lake County). Respectively, those cases were for convictions of manufacture or delivery of at least 15 grams but less than 100 grams of cocaine (720 ILCS 570/401(a)(2)(A) (West 2020) (Class X felony)), with a sentence of 10 years entered on January 16, 2025; manufacture or delivery of at least 15 grams but less than 100 grams of heroin (*id.* § 401(a)(1)(A)), with a sentence of 10 years entered on October 29, 2024; and unlawful possession of a controlled substance with intent to deliver (720 ILCS 570/401(c)(2) (Class 1 felony) (at least 1 gram but less than 15 grams of cocaine)), with a sentence of 9 years entered on January 24, 2018. The certified copies were admitted without objection.

¶ 37     Respondent testified on his own behalf as follows. When W.G.'s case came into care, he was incarcerated at the McHenry County jail. While there, he spoke with the caseworker "a couple times, just to check on a few things." He estimated he spoke to the caseworker four or five times a month. The caseworker verbally informed him of services that YSB wanted him to complete and said she would mail him written copies of the services, but he never received the copies. He was unable to complete services at the county jail because, although he signed up for a program, the date the program was to begin was after he was moved from the jail to an IDOC facility.

¶ 38     Respondent continued that, at the IDOC facility, he did not have access to services, because the facility needed to obtain staff and the programs were limited. However, the programs were currently back open and running as of the hearing date. It took about three or four months after his arrival at the IDOC facility for programs to become available to him. He signed up for services as soon as they were available.

¶ 39     The first service, which needed to be completed before other services, was a drug awareness program. He completed that program and received a certificate. His next service was a healthy relationships program, which covered relationships with everybody. He completed that program as well, approximately a week before the hearing, and received a certificate. He also signed up for two additional classes: a money management class and an "in and out dads or something like that." He had not begun those classes yet. He signed up for the services because YSB had told him that he needed to do something to stay in his son's life, and he would like to stay in his son's life.

¶ 40     Respondent testified that he was unable to stay in contact with YSB while in the IDOC facility. He explained that, at the time, the phone systems required approval for the number called, and the numbers he had were not on the approval list. Currently, however, he was able to call. As

for video visitation with W.G., he had been unable to have those while in the IDOC facility, despite asking. The YSB caseworker had told him that she was trying to set up visitation, but he could not verify whether she had acted on her promise. Respondent testified that he had been doing everything in his power to have contact and some form of relationship with W.G. He had asked the caseworker if he could send money or gifts to W.G., and the caseworker had told him no.

¶ 41 Last, respondent testified that he was working while in IDOC. He estimated that, based on his work contract programs, he would be released in August 2027.

¶ 42 In closing argument, respondent's counsel contended that, regarding the allegation of depravity, respondent was "doing everything in his power to rebuild himself." He was taking classes, working, and staying out of trouble.

¶ 43 On October 8, 2025, following the hearing on parental fitness, the trial court entered a memorandum and decision on parental fitness. The court found that respondent had an extensive criminal history, including a Class 1 felony conviction for unlawful possession of a controlled substance with intent to deliver, for which he was sentenced to nine years' imprisonment on January 24, 2018; and two Class X felony convictions for manufacture and delivery of, respectively, heroin and cocaine, each between 15 and 100 grams, for which he was sentenced to 10 years' imprisonment on October 29, 2024 (heroin conviction), and another sentence of 10 years on January 16, 2025 (cocaine conviction). At the time of the State's petition to terminate parental rights, respondent was incarcerated with a possible parole date of September 1, 2028.

¶ 44 Regarding respondent's fitness, the court found the State's witnesses credible and that the State proved four bases of respondent's alleged unfitness by clear and convincing evidence: (1) respondent failed to maintain a reasonable degree of interest, concern, or responsibility as to W.G.'s welfare; (2) he was depraved in that he had three felony convictions with at least one within

the last five years; (3) he failed to make reasonable progress toward W.G.'s goal of return home between August 9, 2024, and June 4, 2025; and (4) he was incarcerated at the time the petition was filed, he had no contact with W.G. prior to his incarceration, and his incarceration would prevent him from discharging his parental duties for more than two years. The court found that although YSB had contact with respondent while he was in county jail, communications ceased when he was transferred to the IDOC facility. Weekly video visitation with W.G. ceased upon his transfer as well, and he had not provided proof of engagement with required services.

¶ 45    Regarding respondent's testimony, the trial court found that it did not rebut or contradict any of the State's evidence. The court noted that respondent had signed up for services while in the McHenry County jail but could not begin services before transferring to the IDOC facility. It further noted that he was not engaged in services at IDOC but had testified that programs were limited.

¶ 46    The trial court continued that respondent's three felonies and continuous incarcerations had resulted in him not engaging in the ordered services. The court found the evidence showed that respondent was not "remotely close" to having fully complied with the plan to regain custody; "[n]either Mother nor Father were close to reunification." Having found respondent and Courtney unfit, the trial court continued the case for the best interest hearing.

¶ 47                    C. Termination of Parental Rights

¶ 48    Following the best interest hearing on October 23, 2025, the trial court found that W.G.'s foster placement with Amanda O. provided him a "safe, nurturing environment, where he is loved and well cared." W.G.'s biological brother was also placed with Amanda, and Amanda testified that she was committed to adopting and raising W.G. The court found that Amanda was providing for all of W.G.'s needs and had a loving bond with him; he was "well placed and thriving in his

- 13 -

current environment." The court continued that respondent had been incarcerated for all of W.G.'s life, that W.G. would be four years old by the time he would be released, and that respondent had not demonstrated his ability to parent W.G. The court found that the State had "overwhelmingly" proved that it was in W.G.'s best interest to terminate respondent's parental rights.

¶ 49 Accordingly, on December 2, 2025, the trial court granted the State's petition to terminate respondent's parental rights. Respondent timely appealed.

¶ 50                                    II. ANALYSIS

¶ 51 Before addressing the merits of this appeal, we address the State's motion in its response brief to strike references to the full names of minors and related parties in respondent's brief. The State is correct that, in appeals from proceedings under the Juvenile Court Act or the Adoption Act, briefs shall identify the respective juveniles by first name and last initial or by initials only. Ill. S. Ct. R. 341(f) (eff. Oct. 1, 2020). Respondent's brief largely complies with this requirement, although there were a handful of full surnames of parties and other minors listed in case names from cases that were either submitted as exhibits before the trial court or of which the court took judicial notice. We simply remind respondent's counsel to protect juveniles' privacy interests; we refrain from providing full surnames in our disposition.

¶ 52 Turning to the merits, respondent argues that the trial court erred in terminating his parental rights because the court's finding that he was an unfit parent was against the manifest weight of the evidence. Respondent identifies several ways the court erred in finding him unfit: (1) he maintained a reasonable degree of interest, concern, or responsibility for W.G.'s welfare (750 ILCS 50/1(D)(b) (West 2024)); (2) he sufficiently presented evidence rebutting the presumption of depravity against him (*id.* § 1(D)(i)); (3) he made reasonable progress toward the return of W.G. (*id.* § 1(D)(m)(ii)); and (4) section 1(D)(r) of the Adoption Act (*id.* § 1(D)(r)) did not apply to him,

- 14 -

because W.G. was born after he was incarcerated. For the following reasons, we determine that the evidence supported the court's finding of unfitness based on depravity.

¶ 53 A proceeding to terminate parental rights is principally governed by the Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2024)) and the Adoption Act (750 ILCS 50/1 *et seq.* (West 2024)). *In re D.T.*, 212 Ill. 2d 347, 352 (2004). Parental termination proceedings are a two-stage process. *In re J.M.*, 2020 IL App (2d) 190806, ¶ 42; see 705 ILCS 405/2-29(2) (West 2024). The first stage requires that the State prove by clear and convincing evidence that the parent is an "unfit person" under section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)). *In re J.M.*, 2020 IL App (2d) 190806, ¶ 42. A single ground of unfitness under Section 1(D) of the Adoption Act will support a trial court's finding of unfitness. *In re Keyon R.*, 2017 IL App (2d) 160657, ¶ 16. Therefore, we may affirm the trial court's finding where the evidence supports any one of the alleged grounds of unfitness. See *In re Nevaeh R.*, 2017 IL App (2d) 170229, ¶ 20. If the court finds a parent unfit, the court moves to second stage of the proceeding, the best-interest hearing. *In re C.W.*, 199 Ill. 2d 198, 210 (2002).

¶ 54 To reverse a trial court's finding that there was clear and convincing evidence of parental unfitness, a reviewing court must determine that the trial court's finding was against the manifest weight of the evidence. *In re C.N.*, 196 Ill. 2d 181, 208 (2001). A finding is against the manifest weight of the evidence where the opposite conclusion is clearly evident or the decision is unreasonable, arbitrary, or not based on the evidence. *In re N.B.*, 2019 IL App (2d) 180797, ¶ 30.

¶ 55 A parent may be found unfit based on depravity. 750 ILCS 50/1(D)(i) (West 2024); *In re J'America B.*, 346 Ill. App. 3d 1034, 1045 (2004). A rebuttable presumption of depravity arises if the parent has been criminally convicted of at least three felonies and at least one of the three convictions took place within five years of the filing of the petition to terminate parental rights.

750 ILCS 50/1(D)(i) (West 2024). Here, the State admitted certified copies of three of respondent's felony convictions, two of which were from within five years of its petition, thus giving rise to a rebuttable presumption of depravity.

¶ 56   Once a rebuttable presumption of depravity arises, as it did in this case, the parent may present evidence showing that, despite the convictions, the parent is not depraved. *In re Addison R.*, 2013 IL App (2d) 121318, ¶ 24. Once evidence opposing the presumption is produced, the presumption is removed and the issue is determined on the evidence adduced as if no presumption had ever existed. *Id.* The burden of proving depravity by clear and convincing evidence remains with the State. *In re P.J.*, 2018 IL App (3d) 170539, ¶ 13.

¶ 57   Respondent argues that he not only rebutted the presumption of depravity but further contradicted the ultimate finding of depravity. He notes that he presented evidence of his efforts at rehabilitation and self-improvement while incarcerated, including completion of a drug awareness program and a healthy relationships course. He continues that he signed up for additional services and has been working while incarcerated. He argues that the trial court erred by simply relying on the presumption and did not consider his evidence of rehabilitation and forward-looking conduct, rendering the finding of depravity against the manifest weight of the evidence. Although we agree that respondent presented some evidence in rebuttal of the presumption of depravity, we reject his argument that the trial court's ultimate finding of depravity was against the manifest weight of the evidence.

¶ 58   Our supreme court has defined depravity as "an inherent deficiency of moral sense and rectitude." (Internal quotation marks omitted.) *In re Donald A.G.*, 221 Ill. 2d 234, 240 (2006). "Depravity may be shown by a series of acts or a course of conduct which indicates a deficiency in a moral sense and shows either an inability or an unwillingness to conform to accepted

morality." *In re M.B.C.*, 125 Ill. App. 3d 512, 514 (1984). To establish moral deficiency and either an inability or unwillingness to conform to accepted morality, evidence of depravity must show depraved acts of sufficient duration and repetition. *In re Keyon R.*, 2017 IL App (2d) 160657, ¶ 22. A pattern of criminality may sufficiently support a finding of depravity; although a parent's criminal record is only one factor to consider, it is " 'highly persuasive' evidence of depravity." *Id.* ¶¶ 22, 24 (quoting *In re Sanders*, 77 Ill. App.3d 78, 82 (1979)). The trier of fact should also closely scrutinize the character and credibility of the parent. *In re J'America B.*, 346 Ill. App. 3d at 1046. Depravity must exist at the time of the petition to terminate parental rights. *In re A.M.*, 358 Ill. App. 3d 247, 253 (2005).

¶ 59    Here, assuming that respondent's testimony sufficiently rebutted the presumption of depravity, the totality of the evidence supported a finding of depravity such that we cannot say the trial court's finding was unreasonable or the opposite conclusion was clearly evident. The record establishes that respondent had a substantial, consistent, and repeated pattern of criminality, with 11 convictions beyond the 3 recent convictions submitted by the State to establish the rebuttable presumption of depravity. Respondent's 14 convictions included not only convictions related to dangerous drugs but also convictions for assault, obstruction of justice, and obstructing the peace. His 14 convictions stemmed from 78 charges, 31 of which were related to illicit substances. He also reported being detained previously for battery and criminal damage to property, and he reported intimate partner violence with the mother of one of his children, for which he was charged with domestic battery. His criminal history is consistent with a deficiency of moral sense and rectitude.

¶ 60    In addition, respondent was 43 years old by the time of the petition to terminate parental rights, yet his reported work history included only one job that he held around 20 years ago for

about 14 months. He was terminated from that job for falsifying another employee's timesheets, showing a poor sense of moral judgment. And, while respondent claims he has been doing everything he can during his current incarceration to rebuild himself, he has already been a father for two decades without rectifying his apparent course of conduct. He had a daughter, who passed away at 17 years old, with Deshawna, and he has three children with Dawnniesha, his reported wife, who were ages 10, 7, and 2 at the time of the integrated assessment. Courtney was reported to be simply a "casual, sexual relationship."

¶ 61    Further supporting the trial court's finding of depravity were the documented impressions in the integrated assessment, which were consistent with respondent's reported history. The assessment documented that respondent exhibited poor judgment, criminal behavior, and the inability to focus on his children's needs. YSB was also concerned about respondent's substance abuse, and the extent of respondent's substance abuse issues was ultimately unknown, as he was guarded about his use of drugs and never submitted records of a substance abuse assessment. The integrated assessment further reported that respondent lacked insight into his problems, which is consistent with a lack of clear moral sense, and appeared to provide socially desirable responses to questions, which impacted his credibility.

¶ 62    The only evidence presented to contradict respondent's pattern of criminality, problematic employment and relationship history, and report of substance abuse issues, was his testimony that, during his current incarceration, he had completed two services (a drug awareness program, which was required before other services, and a healthy relationship program), signed up for services not yet begun (a money management class and a program for incarcerated fathers), and was working while at the IDOC facility, which he believed would lead to an accelerated release. While we appreciate that respondent's options to rehabilitate and demonstrate his growth are, as with any

incarcerated individual, limited by the system, the short timeframe and limited scope of his efforts stand in stark contrast to an established pattern of problematic decisions and actions prior to his incarceration.

¶ 63    In sum, the record supported the trial court's finding that respondent was depraved, even allowing for the rebuttable of the presumption of depravity based on respondent's three recent felony convictions. Accordingly, the trial court's finding of respondent's unfitness was not against the manifest weight of the evidence, and we affirm the court's termination of his parental rights.

¶ 64                                III. CONCLUSION

¶ 65    For the reasons stated, we affirm the judgment of the circuit court of McHenry County.

¶ 66    Affirmed.